In re In the Matter of the Honorable
Alphonso H. VOORHEES,
Respondent.

No. 69338.

Supreme Court of Missouri,
En Banc.

Oct. 13, 1987.

Opinion by Donnelly, J., Concurring
in Result was Withdrawn and New
Opinion Filed Oct. 19, 1987.

Eugene K. Buckley, St. Louis, for respondent.

James M. Smith, St. Louis, for the Commission.

BLACKMAR, Judge.

■ Respondent, The Honorable Alphonso H. Voorhees, is a Circuit Judge of the Twenty-First Judicial Circuit, and was the presiding judge during late 1985 and all of 1986. The Commission on Retirement, Removal and Discipline established by Art. V, Sec. 24, of the Missouri Constitution served a notice on him charging violation of this Court's Rule 2, Canon 3B(1), (2), (3). After hearing, the Commission [1] filed Findings of Fact, Conclusions of Law and Recommendations. The Commission found violation only of Canon 3B(3), reading as follows:

A judge should report what he believes clearly to be professional misconduct of a judge or lawyer to the appropriate disciplinary agency.

It recommended that Respondent be reprimanded for this perceived violation.

The matter is now before us on the respondent's exceptions to the Findings, Conclusions and Recommendations of the Commission. We conclude that the record does not support the recommendation for discipline, and direct that the respondent stand fully discharged.

It is important at the outset to consider the governing law. The grounds for discipline are set forth in Art. V, Sec. 24(3) of the Missouri Constitution. The only grounds which could conceivably be applied in this case are "misconduct," "oppression in office," and "willful neglect of duty." We will use the term "misconduct" as a convenient collective term for all three of these constitutional standards.

Our Rule 2 adopts the Canons of Judicial Ethics of the American Bar Association.

Violation of these canons may be considered as probative of misconduct, *In re Kohn*, 568 S.W.2d 255 (Mo. banc 1978), but the ultimate finding must be of violation of the constitutional standard.[2] No discipline may be imposed unless it meets that standard. The canons are not statutory, and a charge of violation of the letter of the canons must be squared with the constitutional provisions.

■ Any discipline of a judge, even a reprimand, is a serious matter, and should be imposed only for substantial reasons and with all due process rights preserved. A reprimand is a public denunciation which permanently scars the judge's record. *Cf. Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 636–37, 105 S.Ct. 2265, 2274, 85 L.Ed.2d 652 (1985). It is not a minor matter and should not be lightly imposed. While complaints of violation of the constitutional standards should be thoroughly investigated when complaint is made, zealously prosecuted when possible cause is shown, and punished by appropriate sanctions when proved, judges should not be held up to public censure on account of good faith exercise of judgment. Our system provides other means of correction for erroneous decisions.

Of the contested cases construing Art. V, Sec. 24 which have reached this Court, most are of very little pertinence. *In re Kohn*, 568 S.W.2d 255 (Mo. banc 1978) makes it clear that matters of court administration are not subject to circumspection through the disciplinary machinery. The other cases involved patent misconduct [3] or neglect of duty.[4]

---

1. The Commission's findings inappropriately reported that a cease and desist order had been issued in accordance with Rule 12.08(b)(2). A cease and desist order under that section is an offer in compromise which the respondent is under no compulsion to accept. It is not appropriate to criticize the respondent for not accepting the order, nor to criticize the Commission for issuing the order, or for not accepting the respondent's proposed revisions. The Commission should not have mentioned the order in its published findings, and the opinions concurring in result should not have commented on it.

2. We read *In re Buford*, 577 S.W.2d 809, 813 (Mo. banc 1979), as endorsing and applying the *Kohn* standard.

3. *In re Briggs*, 595 S.W.2d 270 (Mo. banc 1980); *In re Buford*, 577 S.W.2d 809 (Mo. banc 1979); *In re Storie*, 574 S.W.2d 369 (Mo. banc 1978); *In re Duncan*, 541 S.W.2d 564 (Mo. banc 1976); *In re Fullwood*, 518 S.W.2d 22 (Mo. banc 1975).

4. *In re Steinle*, 653 S.W.2d 201 (Mo. banc 1983); *In re Kohn*, 568 S.W.2d 255 (Mo. banc 1978); *In re Corning*, 538 S.W.2d 46 (Mo. banc 1976).

The ultimate decision on discipline, furthermore, is for this Court and not for the Commission. *In re Duncan*, 541 S.W. 2d 564 (Mo. banc 1976). The Commission hears the witnesses and we do not, and so deference to its credibility calls is appropriate. *In re Buford*, 577 S.W.2d 809 (Mo. banc 1979). This case involves very little by way of factual dispute, and none of the Commission's findings appears to turn on matters of credibility. We believe, specifically, that the respondent is a credible witness, and the Commission does not seem to disagree.[5] Our basic task, then, is to examine the record with reference to appropriate legal standards.

## THE FACTS

The amendments to Art. V of the Constitution, adopted by the voters on August 3, 1976 and effective January 2, 1979, sought to establish a unified court system for the state and for each of the 44 judicial circuits. An important part of the new program was the upgrading of magistrates to associate circuit judges, and the authorization for associates to sit on circuit court cases when authorized by the circuit judge or judges.

Attempts at unification of the Twenty-First Judicial Circuit, serving St. Louis County, did not come easily. Although this proceeding is not an appropriate vehicle for the review of all the problems of that Circuit, because the only issues before us are those relating to the recommended discipline of the respondent,[6] some background is necessary. In *Gregory v. Corrigan*, 685 S.W.2d 840 (Mo. banc 1985), we made it clear that under Art. V, Sec. 15.1 the circuit

judges of each circuit, without the participation of associate circuit judges, had the authority to prescribe rules for the conduct of judicial business in the circuit. By *In re: Rules of the Circuit Court for the Twenty-First Judicial Circuit*, 702 S.W.2d 457 (Mo. banc 1985), we authorized the circuit judges of the Twenty-First Judicial Circuit to elect the presiding judge. The rationale is stated in that opinion.

Following the decision in that case the circuit judges of the Twenty-First Judicial Circuit elected the respondent presiding judge on November 15, 1985. He immediately appointed a reorganization committee composed of five circuit judges and one associate circuit judge. The committee proposed a reorganization plan which was approved by vote of the circuit judges on December 19, 1985. The general purpose of the plan was to establish central control over the docketing and assignment of all cases in the circuit and associate divisions and to transfer all clerical employees of the associate divisions, with the exception of one clerk for each judge, to the central clerk's office. The plan was strongly opposed by some of the associates, apparently because they wanted to maintain their own dockets, clerical staffs, and bank accounts, and were dissatisfied with some of the clerical promotions. The conduct of some of the associates is described by the Commission in its Findings of Fact as follows:

9. Tension continued to mount between the associate circuit judges and Judge Voorhees over the impending reorganization plan. On or about January 17, 1986, Judge Goeke prepared approximately 40 pill bottles (exhibit B) with the inscription "No. 31–43. Date 1/17/86 'I

---

5. The Commission's Recommendation No. 3 reads as follows:

In considering whether the recommended discipline of Judge Voorhees is sufficient under the circumstances, we request that the Supreme Court consider the fact that the prompt stay orders of the Supreme Court prevented Judge Voorhees' orders from becoming effective and that Judge Voorhees has enjoyed, throughout his legal and judicial career an excellent reputation for integrity, in-

dustry and temperament. The four associate circuit judges affected by Judge Voorhees' orders of February 27 1986, so testified.

6. Inasmuch as a Special Judge who has no responsibility for supervisory control over the Twenty-First Judicial Circuit is a member of the court which is hearing this case, discussion about current administrative problems of the Twenty-First Judicial Circuit is inappropriate.

DON'T GIVE A SHIT PILLS' Take one pill whenever the urge to worry about reorganization and docket mismanagement occurs." These bottles were distributed by Goeke to judges, clerks, and other persons. On or about January 22, Judge O'Toole removed a sign bearing his name from his courtroom door. The next day, Judge Gerhard removed his name plate and, in early February, Judge Quillin removed his. The judges' stated purpose in removing their name plates was that, since they were facing a retention election, they felt that their names being associated with the confusion resulting from implementation of court reorganization would hurt their chances of being retained. The removal of the name plates caused more confusion as the general public did not know where the courtrooms of the three judges in question were.

10. Sometime during the week following January 23, Judge Gerhard placed a hand-lettered sign (exhibit G) on his courtroom door which read, "The judge of this court *is not* responsible for this disruption. See: Judge A. Voorhees, Div 13, 3rd Floor, Judge B. Corrigan, Div 7, 3rd Floor, Judge M. Nolan, Div 1, 4th Floor, Judge M. Saitz, Div 17, 4th Floor, Judge R. Saitz, Div 6, 3rd Floor, Judge T. Eberwein, Div 35, 2nd Floor." The named judges were the members of the reorganization committee. The placing of the sign caused a number of lawyers and litigants to approach Judge Voorhees with complaints, which caused a disruption of his work schedule.

As the March 3rd date for putting the reorganization into effect approached there was reason to fear that the four associates named above might not cooperate in the reorganization. At a meeting of associates with unit managers on February 20, 1986, two of the four said that they would accept only 150 cases on a docket, two said that they did not want certain types of adult abuse cases, and one said that he did not want afternoon assignments. One demanded additional clerical personnel he had not used before, one said that he would not sign warrants out of hours, and one refused to make entries on the docket sheets as he was hearing cases, thereby requiring additional clerical labors.

■ On February 21, 1986, the unit managers met with the reorganization committee to report on their problems. The respondent was present for parts of this meeting. A transcript was made, of which copies were later furnished to all judges of this Court and to the Commission on Retirement, Removal and Discipline. A copy was offered in evidence at the hearing, to show the information which the respondent had before him when he issued the orders of February 27, 1986, and is now before us for consideration.[7] The transcript detailed the incidents set out in Findings 9 and 10, as well as other problems with the four associates.

On February 25, 1986, the respondent, together with Judge William M. Corrigan, a former presiding judge, and Judge Robert W. Saitz, chairman of the reorganization committee, met with then Chief Justice Andrew Jackson Higgins in Jefferson City. The meeting consumed approximately two hours. The Chief Justice, acting within his administrative responsibility under Art. V, Sec. 8, assured the three that the Supreme Court would back the circuit judges up in their enforcement of the rules made by their authority pursuant to Art. V, Sec. 15.1. Two of the judges testified that the possibility of relieving an uncooperative judge might have been discussed, but it is clear that the Chief Justice was not asked

---

7. This transcript was offered in evidence by respondent for the purpose of showing information which had been reported to him and on which he relied in taking action. A hearsay objection was improperly sustained, because the transcript was not offered to establish the truth of the statements there contained. *See State ex* *rel. 807, Inc. v. Saitz,* 425 S.W.2d 96 (Mo.1968). Testimony at the hearing, furthermore, is not an adequate substitute for the contemporaneous reports made to the respondent. The transcript, by reason of the respondent's offer of proof, is fully available for our consideration.

to, and did not, authorize the relief order of February 27, 1986.[8]

On Wednesday, February 26, 1986, Judge Goeke addressed a provocative letter to respondent, with copies to all judges of the circuit, in which he asserted that the reorganization plan would not work unless the associates collectively were allowed to develop a plan for their divisions "without interference", and suggested that the Reorganization Committee should "release control over the associate divisions." A majority of the circuit judges met at noon and designated Judge Robert Saitz to draft an order authorizing the suspension of assignments to the four recalcitrant associates. Thirteen of the other nineteen circuit judges, not counting respondent, signed the authorization. The remaining six were not present at the meeting and were not asked to sign the authorization because they were not sympathetic to the reorganization and had regularly voted with the associates on administrative matters.

The respondent testified that he considered the authorization to be a directive to him, and other circuit judges testified to the same effect, but he did not immediately issue a conforming order. He considered the possibility of monitoring the assignments on March 3 to see whether there was any discernible failure of cooperation, but the assistant court administrator then suggested that attempts at subversion could not be detected for several weeks and that by that time the reorganization plan would be irreparably damaged. It appears that many members of the public had been summoned to appear Monday morning, March 3, in the divisions presided over by the four dissenting associates, and so it was important to minimize confusion on that day.

At about 11:30 a.m. on February 27, the respondent caused identical letters to be delivered to the four associates reading as follows:

> WHEREAS by act and deed you have demonstrated your unwillingness or inability to participate within the framework of the judicial system of this Circuit;

NOW THEREFORE it is ORDERED that commencing March 3, 1986, at 8:00 a.m., you are relieved of all docket, caseload and trial responsibility in this Circuit and you are to relinquish control of your facilities including your courtroom and chambers until further order of the Presiding Judge.

The respondent testified that he had hoped to arrange a meeting with the associates and to inform them that the relief orders would be withdrawn as to any associate who expressed his willingness to accept and dispose of assigned cases in accordance with the reorganization plan, and sought to notify them that he wanted to meet. One of the four was agreeable to meeting with the respondent in the presence of a state senator, but the respondent considered, properly we think, that such a meeting would be inappropriate in the administration of the judiciary. Respondent spoke with one of the four who said that he was too upset to confer. A third received notice of the requested meeting but did not respond. The fourth said that he did not receive any notice of the request.

The associates, instead of meeting, chose to file on Friday, February 28, 1986, a *pro se* application in this Court seeking to set aside the relief orders. On that same day, we entered a stay order which included a firm directive to the associates to comply with the directions of the presiding judge. Copies of the Canons of Judicial Ethics, Rule 2, Canon 3, and of the guidelines from the Presiding Judges' Handbook were appended to an order. Rule 2, Canon 3(A)(5) [9] and paragraph 6 of Guideline No. 13 (quoted below) were underscored.

The respondent testified that he had no purpose of disciplining the four associates, but was simply concerned with the administration of the court and the implementation of the reorganization plan. He arranged for three circuit judges and one associate from the circuit to sit in the divisions presided over by the relieved judges, and contemplated requesting this Court to assign judges from outside the circuit to assist if

---

8. The Chief Justice was not called as a witness.

9. "A judge should dispose promptly of the business of the Court."

184

necessary. He tried to call Chief Justice Higgins before he delivered the relief orders, but was unable to reach him until Friday, February 28. By that time the associates' application was already on file and was being considered by this Court.

## THE CHARGES

The formal charges are set out in a Notice, issued pursuant to Rule 5.13(c) on December 5, 1986 and reading as follows:

The Commission on Retirement, Removal and Discipline, appointed to the provisions of Article V, Section 24 of the Constitution of Missouri, hereby notifies you to be and appear before it on the 28th day of January, 1987, at the offices of the Missouri Court of Appeals, 111 No. Seventh Street, St. Louis, Missouri, at 9:00 a.m., then and there to answer the following:

That while holding the office of Circuit Judge of St. Louis County, Missouri, you engaged in the following conduct which is in violation of Article V, Section 24 of the Constitution of the State of Missouri.

1. That on February 27, 1986, you issued an administrative order as Presiding Judge of the 21st Judicial Circuit to Associate Circuit Judges George R. Gerhard, Josephe A. Goeke, III, Daniel J. O'Toole and Dennis J. Quillin purporting to relieve the named Associate Judges of their dockets and directing that they relinquish control of their courtrooms and chambers. Further, that this order failed to abide by the procedure set out in Guideline No. 13 of the Guidelines from the Presiding Judges' Handbook which were specifically set out in the Appendix to the Supreme Court's decision *In Re: Rules of the Circuit Court for the 21st Judicial Circuit*, 702, S.W. 2d 457, 462 (Mo. banc, 1985). Those guidelines are as follows:

"In the event that another judge of the circuit court refuses a reasonable directive of the presiding judge, interferes with the effective operation of the court, abuses his judicial position, or violates the Judicial Canons of Eth-

ics, the presiding judge should consider one or more of the following options:

1. Explain to the resisting judge the reasons for the directive or position taken and listen to the response. Reevaluate your position.

2. If the problem persists, determine the available alternatives. Discuss and evaluate the alternatives. Discuss and evaluate the alternatives with the resisting judge.

3. Discuss the position of both parties with the other judges and reevaluate your position.

4. Present the problem to the court en banc or a committee of judges for a recommendation, or establish a procedure within the circuit for resolving disputes between judges and the presiding judge, such as requiring the resisting judge and the presiding judge to state in writing, within a reasonable time, his or her reasons for a position. Forward all to a higher authority such as a court committee, the court en banc, or the chief justice of the Supreme Court for final determination.

5. Report the resisting judge to the chief justice of the Supreme Court for appropriate action.

6. Where the refusal is willful and continual, report the resisting judge to the Commission on Retirement, Removal and Discipline."

The above-mentioned conduct is in violation of Supreme Court Rule 2, Canon 3B(1)(2)(3).

You are further notified that the proceedings will be held at said time and place to fully investigate the aforementioned allegations in accordance with the Rules of the Supreme Court of Missouri.

If you desire to file a response it should be filed with the Secretary of this Commission by the 5th day of December, 1986. The Secretary's name and address are listed thereon.

The Commission's findings and conclusions, surprisingly, do not relate explicitly to any factual matter alleged in the No-

tice.[10] The only finding of violations has to do with the incidents described in the Commission's findings 9 and 10, quoted above, and the respondent's failure to report these incidents to the Commission.

█ We can order judicial discipline only in accordance with the findings of the Commission. If findings are inadequate we might simply pretermit consideration of the charges in the Notice, or, conceivably, might remand the case to the Commission for further report. We believe, however, that, by lenient construction, the Commission's findings and conclusions are arguably responsive, and that the interests of the bench, the bar, and the public will be served by a full exposition. The parties have briefed the issues as though the Commission had found that the matters set forth in the Notice were proved, and a remand is unnecessary. We conclude that the record fails to demonstrate misconduct in the respects alleged in the Notice.

The problem with basing judicial discipline on the "guidelines" is that they speak in language which is precatory rather than mandatory. The trial judge is told to "consider one or more of the following options". The record discloses numerous meetings and discussions over many weeks, including a consultation with the Chief Justice, which is one of the suggested options. We sense from the record that the respondent showed great patience in the face of trying circumstances, often demonstrating civility in response to contentious discourtesy. He could well have concluded that further importunities would have been unavailing. He can hardly be found guilty of misconduct for failing to exhaust all of the alternatives, when all he is directed to do is to consider "one or more".

The guidelines, furthermore, call for a report to the Commission only for refusal which is "willful and continual". The respondent testified to his concern, on Thurs-

day, February 27, lest the recalcitrant associates sabotage the reorganization plan which was designed to take effect on the following Monday, March 3. Up to this time there had been grumbling, quibbling and foot dragging, but no express refusal. The respondent might well have concluded that the time for resort to the Commission, under the guidelines, had not yet arrived. Our order of February 28, 1986, indeed, contained a strong directive to the associates, and emphasized that a report to the Commission would be appropriate if there were willful and continued refusal.

Had the respondent reported to the Commission before issuing the orders on Thursday, February 27, furthermore, there is absolutely nothing it could have done to ensure that the divisions would proceed as directed on the following Monday. It has the power only to receive charges, to investigate, to conduct hearings, and to recommend disciplinary actions. Its processes are inherently deliberate. It has no authority to superintend the operation of the courts, to mediate ongoing disputes, or to deliver an administrative "chewing." Its counsel frankly admitted this during oral argument.

We conclude that the Commission has failed to establish "misconduct," "willful neglect of duty," or "oppression in office," simply because the respondent did not report to the Commission before issuing the relief order.

The Notice, by an exceedingly broad construction, might be read as charging that the very issuance of the relief order constituted an act of judicial misconduct. The Commission's Conclusion 3 reads as follows:

3. There is no specific constitutional or statutory authority for a presiding judge to order the removal of associate circuit judges from their courtrooms and chambers and relieve them from their judicial

---

**10.** Judge Rendlen's assertion that we could find violation of Canon 3(B)(1) when the Commission did not is at odds with the constitutional provision, Art. V, Sec. 24.3, which authorizes discipline following recommendation by the Commission, "the supreme court en banc ... concurring with such recommendations ..."

Our authority under Rule 12.08(c) to "make such order as to respondent as it deems just" may not be read to enlarge on our constitutional authority. The expression of a personal opinion as to a canon which the Commission did not find to have been violated, then, is quite out of line.

responsibilities, under circumstances such as were present in this case. Such action by Judge Voorhees constituted an act of severe discipline of the four associate circuit judges. The sole authority for discipline of judges rests with this commission and the Supreme Court. Article V, Section 24, Constitution of Missouri.

■ The courts of review, including this Court, are open for the consideration of legal error. Present day courts have myriad administrative responsibilities, and discipline is no more appropriate for an administrative error than for a legal error. The basic legality of the order, then, is not a proper matter for the Commission's consideration. It would at the very least have to find that the challenged order was so far out of line as to constitute "misconduct," or, perhaps, "oppression in office." *Cf. In re Storie*, 574 S.W.2d 369 (Mo. banc 1978), involving an unauthorized monetary assessment against persons pleading guilty and the maintenance of an off-budget fund fed by these assessments. The Commission neither proffered nor found any such charge. Whether the attempted relief was an administrative act or an act of discipline depends on a determination of the respondent's purpose and intent, on which issues the Commission did not make a finding. Nor should we.

■ The respondent testified that he had no purpose of inflicting discipline, or of interfering with the associates' status or tenure as judges, but was simply trying to get all divisions of his court to operate in accordance with the reorganization plan. It is easy to conceive of situations in which a presiding judge may appropriately direct another judge to turn over his courtroom and chambers, against the displaced judge's will, in order to facilitate the total effort of the court. The respondent testified that he would withdraw the relief order as to any judge who expressed his willingness to cooperate; none apparently was willing to meet with him. He advised the two judges he was able to reach on the telephone as to the conditions for removing the order would be lifted. The relief order and these contemporaneous discussions must be considered together. The order did not strip the associates of their offices. It simply relieved them of their assignments until they gave assurance that they would perform their assigned duties. The respondent had no obligation to clear his contemplated order with the Commission, and it had no authority to approve or disapprove. The attempted relief was an administrative act, and not an act of discipline.

A majority of the circuit judges, acting within their authority, made a judgment call which the respondent put into effect. He did not publicize the relief order; it reached the press by other means. The associates asked this Court for relief, which was promptly forthcoming. Our order included a stern injunction to the associates to comply with the orders of the presiding judge. Perhaps this gave them second thoughts about perverse behavior. The challenged orders never took effect. We are not here concerned with the wisdom of the respondent's administrative decision. There may be a reluctance to take firm action if the spectre of disciplinary proceedings looms over administrative decisions. Even a successful defense does not completely erase the effect of widely published charges.

We conclude from the whole record that disciplinary action was not appropriate for the conduct charged in the notice. This conclusion makes a ruling on the respondent's motion to dismiss unnecessary.

## THE COMMISSION'S RECOMMENDED DISCIPLINE

The Commission's Conclusions of Law 1 and 2 read as follows:

1. Judge Voorhees clearly believed that the acts of Judges Gerhard, O'Toole, and Quillin in removing their name plates from their courtroom doors, the act of Judge Gerhard in posting a sign referring persons reading the sign to the judges of the reorganization committee, and Judge Goeke's distribution of the "pills" were acts of judicial misconduct.

2. Having such a belief, Judge Voorhees had a duty, by reason of Rule 2, Canon 3B(3) to report such conduct to

the Commission of Retirement, Removal and Discipline. Judge Voorhees breached such duty by not reporting such conduct and, by not so doing, violated Rule 2, Canon 3B(3). Judge Voorhees' explanation that he did not report such conduct because he believed it would cause further problems is not an acceptable excuse.

On the basis of these conclusions it issued the following recommendation:

> The commission recommends that Judge Voorhees be reprimanded for failure to report to the commission what he clearly believed to be judicial misconduct on the part of Judges Gerhard, Goeke, O'Toole and Quillin.

■ One problem is that no word, phrase or line of the Notice relates to the transactions described in these conclusions. The Notice spoke only of the relief order and the guidelines. We would be justified in pretermitting consideration of Conclusions 1 and 2 because they are outside the charge. They do not show "willful and continual" refusal, so as to bring Guideline 6 into consideration. The doctrine of amendment to conform to the proof should be applied to disciplinary proceedings with great caution. Any amendment must be disclosed to the respondent before submission to the Committee. *See In re Briggs*, 595 S.W.2d 270 (Mo. banc 1980).

In this instance also, however, we elect to rule the matter on its merits, because we conclude that the record does not support a finding of misconduct on the part of the respondent in failing to report the incidents relating to the removal of signs, the posted notice, or the "pills."

■ Canon 3(B)(3) serves the salutary purpose of inhibiting "coverups." It imposes on judges the duty of reporting to the Commission about matters which come to their attention and about which the Commission is previously uninformed. Without this canon, a judge might be tempted to avoid "rocking the boat," even though he or she has particularized knowledge of wrongdoing by a colleague or by a lawyer. The canon clearly informs as to where duty lies. We are unable to say, however, that every failure to inform about well-publicized misbehavior of a fellow judge may properly be branded "misconduct." The canons must be given a reasonable construction.

The Commission concludes that the respondent "clearly believed" that the described actions of the associates were acts of judicial misconduct. This conclusion flies in the face of the respondent's testimony, as follows:

> Q. Did you report any of these judges at the time to the Commission on Retirement, Removal and Discipline?
>
> A. No, sir.
>
> Q. Why not?
>
> A. These problems or at least the handling of them at that time were not disciplinary. They were not for punishment, they were to upgrade our courts. They were actions that we felt were necessary so that our courts could function so that our dockets could function. I wasn't even convinced in my mind then or at any other time and I'm—as to whether these actions were violations of the canons on their part. . . .

Tr. Vol. III, Part II at 232.

Nothing in the record shows that the respondent "clearly believed" that the associate judges' actions constituted misconduct such as to subject them to discipline. The Commission cannot convert something he said into something he simply did not say, under the guise of assessing credibility.

Most of the incidents were matters of public knowledge, beginning with an article in the St. Louis Globe-Democrat dated February 4, 1986, which reported about the sign incidents. There was extensive newspaper coverage after February 27. There is a question whether a judge may be criticized for not making a report when full information is readily available.

■ The "pills" incident was not contemporaneously reported in the newspapers, insofar as the record shows, but there is no evidence that it interfered with the administration of the court or caused problems for the presiding judge. Not every

incident of puerile or boorish behavior is a ground for judicial discipline. The preparation and distribution of the pills, coarse as it was, arguably represents the exercise of a First Amendment right.[11] The respondent cannot be faulted for not reporting this incident.

The record shows, furthermore, that two circuit judges filed separate complaints with the Commission on March 19, 1986, to which were appended copies of the transcript of the meeting of February 21, 1986 between the reorganization committee and the unit managers. (See Footnote 7). No delict on the part of the respondent impeded or delayed the Commission in any respect. He could have added little to the transcript, in which the matters the Commission referred to in the charges were fully documented. The Commission was seasonably and fully informed.

The only basis for discipline asserted by the Commission is not supported by the record.

### THE COMMISSION'S ADVISORY FINDINGS

The Commission's Conclusion of Law No. 4 reads as follows:

The action of Judge Voorhees in issuing the orders in question, and the inevitable publicity that followed, add another sorry chapter to the history of internal bickering which has marred the image of the Circuit Court of the Twenty-first Judicial Circuit in recent years. *See Gregory v. Corrigan*, 685 S.W.2d 840 (Mo. banc 1985); *Nolan v. Stussie*, 695 S.W.2d 869 (Mo. banc 1985); and, *Rules of the Circuit Court for the Twenty-first Judicial Circuit*, 702 S.W.2d 457 (Mo. banc 1985); and Administrative Orders of the Presiding Judge of the Twenty-first Judicial Circuit, No. 67950 (Mo. banc 1986), for examples of controversy between the judges of the circuit that have received widespread publicity.

Recommendation No. 2 reads as follows:

The commission further recommends that if the judges of the Twenty-first Judicial Circuit are unwilling or unable to assure the people of their area the orderly administration of justice, that the Supreme Court, as suggested in *In Re: Rules of the Circuit Court*, Id. at 460, relieve any then serving presiding judge of his or her duties and assign a neutral judge to supervise the circuit, subject to the approval of the Supreme Court, until such time as the orderly administration of justice in the circuit can be assured.

The Conclusion and the Recommendation are inappropriately included in the Commission's report. The Commission's sole authority in discipline cases is set out in Art. V, Sec. 24(3), reading as follows:

Upon recommendation by an affirmative vote of at least four members of the commission, the supreme court en banc, upon concurring with such recommendation, shall remove, suspend, discipline or reprimand any judge of any court or any member of any judicial commission or of this commission, for the commission of a crime, or for misconduct, habitual drunkenness, willful neglect of duty, corruption in office, incompetency or any offense involving moral turpitude, or oppression in office. No action taken under this section shall be a bar to or prevent any other action authorized by law.

Art. V, Sec. 24(8) states very clearly that the Commission is not to undertake additional duties, in the following language:

Additional duties shall not be imposed by law or supreme court rule upon the commission on retirement, removal and discipline.

We well know the agonizing problems of the Twenty-First Judicial Circuit. We have tried to find solutions, in the exercise of the supervisory control conferred upon us by Art. V, Sec. 4.[12] The judges of this Court

---

11. *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *State v. Swoboda*, 658 S.W.2d 24 (Mo. banc 1983).

12. *In re: Rules of the Circuit Court for the Twenty-First Judicial Circuit*, 702 S.W.2d 457 (Mo. banc 1985); *Nolan v. Stussie*, 695 S.W.2d 869 (Mo. banc 1985); *Gregory v. Corrigan*, 685 S.W.

have not always agreed. We should be willing to receive and to consider suggestions. But suggestions by the Commission on Retirement, Removal and Discipline, in the course of an official transmission, are not in order, because they exceed the Commission's limited function.

 The cases holding that a grand jury has no authority to issue a report, apart from such indictments as it sees fit to return, are in point. *See In re Interim Report of Grand Jury*, 553 S.W.2d 479 (Mo. banc 1977); *In re Report of Grand Jury Impaneled on June 22, 1979 in Shelby County*, 612 S.W.2d 864 (Mo.App.1981); *In re Regular Report of Grand Jury*, 585 S.W.2d 76 (Mo.App.1979). Similar considerations apply to the Commission.

We believe that it is important to comment as we have for the future guidance of the Commission. If the Commission acts outside of its limited function its members may form predilections and tentative conclusions which tend to impede their ability to deal with ensuing disciplinary matters with total detachment.

The appropriate correction is to strike the Commission's Conclusion of Law No. 4 and Recommendation No. 2.

### CONCLUSION

The record shows no basis for disciplinary action against respondent. The respondent was dealing with a very difficult situation. He exercised his judgment. There are those who, with hindsight, might question some of his decisions, but there is absolutely no indication of misconduct, oppression in office, neglect of duty, or any other constitutional ground for discipline.

The Commission's recommendation for discipline is rejected, for the reason that the record does not demonstrate any violation of Article V, Sec. 24(3). The respondent is fully discharged. The Commission's Conclusion of Law No. 4 and Recommendation No. 2 are stricken.

BILLINGS, C.J., and FLANIGAN, Special Judge, concur.

2d 840 (Mo. banc 1985); *In re Administrative*

ROBERTSON, J., concurs in separate opinion filed.

WELLIVER, J., concurs in result in separate opinion filed.

DONNELLY, J., concurs in result in separate opinion filed and concurs in separate concurring in result opinion of WELLIVER, J.

RENDLEN, J., concurs in result in separate opinion filed.

HIGGINS, J., not sitting.

ROBERTSON, Judge, concurring.

I concur in the principal opinion. Respondent is charged with a violation of the Canons of Judicial Ethics, Rule 2, Canon 3B(1), (2), (3). More specifically, the Commission on Retirement, Removal and Discipline's Notice charges that respondent "failed to abide by the procedures set out in Guideline Judges' Handbook which were specifically set out in the Appendix to the Supreme Court's decision in *In Re: Rules of the Circuit Court for the Twenty-First Judicial Circuit*, 702 S.W.2d 457, 462 (Mo. banc 1985)." The Commission found that respondent's order of February 27, 1986, "constituted an act of severe discipline of the four associate circuit judges."

The principal opinion states "that disciplinary action was not appropriate for the conduct charged in the notice.... [N]o word, phrase or line of the Notice relates to the transactions described in [the Commission's] conclusions." (at 186– 187.) The principal opinion's statement is both accurate and sufficient to support a conclusion that the Commission failed to inform respondent adequately of the charges which he would be called to answer and which the Commission ultimately found against him.

Our constitution guarantees that judges charged with violations of the canons of judicial ethics are entitled to the full complement of due process rights. Mo. Const. art. V, sec. 24. Having failed to advise respondent of the charges he would be

*Orders*, No. 67950, not reported.

called to answer, the Commission's recommendation cannot stand.

The principal opinion correctly concludes that this failure of due process is sufficient to decide the case.

The Commission properly undertook its investigation and hearing in this matter. Respondent's administrative order, issued in *anticipation* of the associate circuit judges' refusal to adhere to the circuit's new administrative plan, is of questionable legal ancestry. The legal issue—whether respondent has the authority to issue such an order—is not properly before us in this case. Aside from that legal issue, in matters of discipline one cannot naively assume that all administrative orders have a benign purpose; in this case, the administrative order issued by respondent at the direction of a majority of the circuit judges [1] has the practical effect of suspending the associates from their public office indefinitely. Suspension is a matter of discipline. Discipline is the responsibility of the Commission on Retirement, Removal and Discipline of Judges. Thus, whether such an order would be an appropriate subject for discipline under proper proceedings before the Commission is a question of respondent's intent, measured not only by his testimony, but also by the circumstances surrounding respondent's actions.[2]

One hopes that the shoddy state of affairs in the Twenty-first circuit grew out of a genuine, properly-motivated concern for the welfare of those who come before the courts there. Early on, the presiding judge (selected when this Court still recognized the associates' constitutional authority to vote) determined to disregard the administrative rules adopted by the circuit judges under the constitutionally-sanctioned procedures. This contumacious act led to our decision not to "enforce" Mo. Const. art. V, sec. 15.3—itself an act finding neither support nor justification in the constitution. *In re: Rules of the Twenty-First Judicial Circuit,* 702 S.W.2d 457 (Mo. banc 1985). Volatile circumstances arose. Pure motives gave way to strong-armed assertions of authority. Under these circumstances, one can imagine such administrative orders wielded as a sword for purposes other than the administration of justice. Yet given the Commission's actions, whether in this case the administrative orders had other purposes is not properly before us.

Judge Welliver's lengthy opinion concurring in result deserves comment. While the members of this Court have become acclimated to the *ad hominem* nature of our brother's dissents, those he has shepherded into his sights today are without ability to respond or defend.

Since that fateful day in 1215 in a meadow called Runnymeade, when King John first announced its painful birth, due process has been among our most important entitlements, separating us from those governments which replace a fair hearing with a star chamber. Our courts have cherished it, nurtured it, protected and preserved it. And our constitution has guaranteed it. Just as respondent has found refuge under the shelter of due process in this case, due process is no less the rightful inheritance of associate circuit judges.

Certainly the associate circuit judges must bear their rightful portion of the blame for the problems in St. Louis County. No matter the depth of our disappointment or the righteousness of our indignation, however, the associate circuit judges are entitled to defend their conduct before an impartial tribunal, not be declared guilty in the pages of the Southwestern Reporter in a unrelated case. It appears that Judge Welliver's opinion charges, prosecutes and pronounces the associates guilty without a

---

1. A particularly troubling aspect of this case is the fact that respondent appears merely to have carried out the command of a majority of the circuit judges in issuing the order. I doubt that I could impose discipline on the presiding judge under these circumstances. It is ironic that of all the actors in this drama, Judge Voorhees is widely regarded as among the most fair-minded and even-tempered of those who serve as judges within the circuit.

2. If, for example, an administrative order is issued for the purpose of publicly embarrassing a fellow judge, or for the purpose of imposing discipline, such conduct would be tantamount to oppression in office.

hearing.[3] King John might approve of such proceedings. Those who forced his hand to the Magna Charta would have none of it; neither should we.[4]

Nor is this a case calling for any discussion of a solution to the problems of the twenty-first judicial circuit. We are limited to the discipline issue. Our obligation and our duty is to decide the case before us and no more.[5]

Finally, Judge Welliver's assertion that this Court's denial of respondent's application for a writ of prohibition is—as he describes it—an act of unclean hands, is troubling.[6] Judicial discipline in Missouri is the province of a Commission on Retirement, Removal and Discipline created by express constitutional provisions. Mo. Const. art V, sec. 24. This Court's function in individual matters of discipline is limited to concurring with the Commission's recommendation and imposing appropriate discipline as permitted under the constitution, or in rejecting the Commission's recommendation and dismissing the charges. Mo. Const. art. V., sec. 24.3.

The jurisdiction of the Commission is established by the constitution; we possess no authority to interfere with the investigatory or hearing processes. Our role is limited by the people to reviewing the Commission's work once it is completed. We have the final choice to veto its recommendations, but we cannot dispossess the Commission of its constitutional authority to investigate and take to hearing any charge of judicial misconduct laid before it. It is this Court's duty to prevent ultimate injustice at the hands of the Commission; this case shows that we are willing to fulfill our constitutional duty faithfully.

Were we to permit a majority of the members of this Court to prohibit the Commission from investigating charges of judicial misconduct and from proceeding to a hearing on those charges by the issuance of a writ of prohibition, we would place our system of judicial discipline in jeopardy. Judge Welliver decries the judicial politics he describes as "dangerous and sinister." What could be more dangerous or more sinister than four judges of this Court seizing the authority to halt matters of judicial discipline properly pending before the Commission? One need not be gifted with too keen an imagination to understand the po-

3. Rule 12.23 requires that proceedings before the Commission remain confidential prior to the filing of a recommendation with this Court. Whether the associate circuit judges in this case are the focus of an investigation or hearing by the Commission for the acts described by the principal opinion and condemned by Judge Welliver is a matter which we are not privileged to know at this juncture. Three possibilities exist: First, there may be no charges before the Commission. Second, the Commission may have heard the charges and determined that no discipline was warranted. Third, charges may be presently pending before the Commission.

4. Lack of due process infects the whole of this episode, which appears to arise from the February 21, 1986 "hearing" and the conduct of the associates preceeding it. That "hearing" apparently provided a sufficient basis in the minds of a majority of the circuit judges to direct respondent to issue his order. The "hearing" was convened by several circuit judges because some of the associates had called and attended a meeting February 20 because they "thought it would be a good idea to get some uniformity and discuss problems, because March 1st [the effective day of the administrative changes] was coming up pretty fast and they [the associates] hadn't had a meeting with anybody." Tran-

script, February 21, 1985, Meeting, 3. The circuit judges conducting the "hearing" wanted some information on the associates' meeting. The associate circuit judges were not asked to attend. It is at this meeting that the puerile conduct of some of the associates is discussed. In all honesty, we can understand the frustration of the circuit judges. Yet frustration is never a substitute for good judgment; anger is no justification for precipitous action.

5. Each of us holds strong feelings about a course of action which will assist in resolving the shameful situation in the twenty-first judicial circuit. The steps we have taken to date have misdirected, however. I have recanted the position I took in *In Re the Rules of the Twenty-First Judicial Circuit*, 702 S.W.2d 457 (Mo. banc 1985) and now believe that decision has added to the difficulties in St. Louis County. *See In Re Administrative Orders of the Presiding Judge of the Twenty-First Judicial Circuit*, No. 67950, unpublished, (Robertson, J. concurring in part and dissenting in part) attached hereto as Appendix A.

6. I find nothing in this record to support Judge Welliver's less than delicate questioning of the motives of the Commission, either.

tential for mischief such a "power" would carry.

APPENDIX A

In re: Administrative Orders of the Presiding Judge of the Twenty-First Judicial Circuit

No. 67950

May 13, 1986

UPON MOTION FOR AN ADMINISTRATIVE ORDER TO QUASH ADMINISTRATIVE ORDERS NO. 9–1986 AND NO. 13–1986 OF THE PRESIDING JUDGE OF THE TWENTY–FIRST JUDICIAL CIRCUIT, AND TO APPOINT A MASTER TO SERVE AS PRESIDING JUDGE OF THE TWENTY–FIRST JUDICIAL CIRCUIT

## MEMORANDUM CONCURRING IN PART AND DISSENTING IN PART

Once again this Court is faced with administrative unrest in the Twenty-First Judicial Circuit. Three associate circuit judges now ask us to quash Administrative Order No. 9–1986 which requires that preliminary hearings be held not "less than six (6) days after the date of said prisoner's preliminary arraignment" and Administrative Order 13–1986 which limits these associate circuit judges from setting more than fifteen preliminary hearings "on any one of the twelve (12) dockets established for preliminary hearings and misdemeanor trials each week." I believe that these orders are within the general administrative authority of the Presiding Judge. Mo. Const. art. V, § 15.3. I concur in the Court's order overruling the motion as to these Administrative Rules.

These associate circuit judges also ask that we appoint a special master to act as presiding judge of the Twenty-First Judicial Circuit.

The history of this vexing situation can be traced through *Gregory v. Corrigan*, 685 S.W.2d 840 (Mo. banc 1985), and *Nolan v. Stussie*, 695 S.W.2d 869 (Mo. banc 1985), to *In re: Rules of the Circuit Court for the Twenty-First Judicial Circuit*, 702 S.W.2d 457 (Mo. banc 1985) (hereafter the October 11 decision).

In the October 11 decision, this Court suspended the operation of that part of Mo. Const. art. V, § 15.3, which "purports to grant to associate circuit judges the right to participate in the election of the presiding judge" in the Twenty-First Judicial Circuit. *Id.* at 459. The October 11 per curiam weighed the right of the people to an orderly administration of justice against the right of the people to speak through the Constitution, and determined that the constitutional provisions could not be enforced.

I joined the October 11 decision because of the seriousness of the threat to the orderly administration of justice within the Circuit, and with the intent that the solution proposed in that opinion was (1) temporary, and (2) limited in application to the Twenty-First Judicial Circuit. My concurrence was also born of the hope that such a strong statement of the Court's resolve to remedy the inexcusable intramural bickering in that circuit would act as a catalyst in bringing about "an amicable resolution to [the Circuit's] problems." *Id.* at 457. It now appears that this hope was without foundation.

With the benefit of hindsight, I now believe that I was incorrect in joining in the October 11 decision, even to the extent of the limited, temporary nature in which I believe it was cast.

While it is beyond dispute that both factions in the Circuit share fault—and there is plenty of that to go around—the October 11 decision appears to have encouraged those who felt vindicated by it to express their "victory" in radical terms.

On February 27, 1986, the Presiding Judge of the Twenty-First Judicial Circuit issued Administrative Orders to Associate Circuit Judges George R. Gerhard, Joseph A. Goeke, III, Daniel J. O'Toole and Dennis J. Quillin purporting to relieve the named associate circuit judges of their dockets and directing that they relinquish control of their courtrooms and chambers. This Court stayed these Administrative Orders

by order on February 28, 1986. This Court's order directed the named associate circuit judges to "carry out and perform all of the duties and functions of their office until further order of this Court" or until "further order of the circuit judges acting through the Presiding Judge of the Twenty-First Judicial Circuit pursuant to this Court's Per Curiam in case No. 67397 [the October 11 decision]."

To the extent that this Court's order of February 28, 1986, prevented the Presiding Judge from enforcing his Administrative Orders of February 27, 1986, I concurred in the Court's order.

The fact remains that there is no constitutional or statutory authority in the Presiding Judge to order the removal of these associate circuit judges from their courtrooms and chambers and to relieve them of the dockets in *these* circumstances. Each of these movants is holding office according to the mandates of Mo. Const. art. V. The Presiding Judge holds no greater claim to his office than do the movants. A presiding judge is to "have general administrative authority over the court and its divisions." *Mo. Const. art. V, § 15.3.* Such power does not, in my view, include the power to suspend another judge from his judicial duties for the reasons expressed by the Presiding Judge. *See Graham v. Cannon,* 574 P.2d 305 (Okla.1978). In the absence of appropriate action by the circuit judges to quash the February 27, 1986 Administrative Orders of the Presiding Judge, I believe this Court should enter its order quashing those orders, *sua sponte.*

I further believe that our responsibility to assure the people of the Twenty-First Judicial Circuit of the orderly administration of justice demands that we take an additional step. With regret, I respectfully submit that this Court can no longer avoid direct intervention into the administration of the Twenty-First Judicial Circuit. The animosities which exist between the judges of that circuit have clouded judgment on

each side. In the October 11 per curiam, this Court stated:

> In the event that there be *any* further evidence of inability of the Twenty-First Judicial Circuit to operate the circuit so as to assure the orderly administration of justice, this Court is prepared to relieve any then serving presiding judge of his or her duties and to assign a neutral judge to supervise the circuit subject to the approval of this Court until such time as the orderly administration of justice be assured in the Twenty-First circuit. The people of St. Louis County are entitled to nothing less. (Emphasis added).

*In re: Rules of the Circuit Court, id.* at 460. I am convinced that the time has come for us to intervene.

This has never been a "legal" problem. It has always been a managerial problem. Had we recognized that fundamental fact on October 11, we could have avoided the necessity of this Court determining that "we cannot and will not enforce that part of art. V, § 15.3, which purports to grant to associate circuit judges the right to participate in the election of the presiding judge...." *Id.* at 459.

Were I empowered to do so, I would exercise our supervisory authority under Mo. Const. art. V, § 4, and appoint a jurist from outside the geographic boundaries of the Eastern District Court of Appeals as presiding judge of the Circuit, to serve with the full authority of this Court, until such time as the orderly administration of justice is restored in the Circuit.

/s/EDWARD D. ROBERTSON, Jr.,
 Judge

DONNELLY and RENDLEN, JJ., concur.

WELLIVER, Judge, concurring in result.

I concur in result.[1] I agree that the cases and law cited and collected in the

---

1. References herein to matters which may have been deleted or changed in the principal opinion subsequent to circulation of this opinion are noted for convenience of the reader. With this exception and the addition of this footnote, the opinion is now recirculated as originally written.

 **The Moving Finger writes; and, having writ,**
 Moves on: nor all your piety nor wit
 Shall lure it back to cancel half a line,

principal opinion constitute a clear and scholarly statement of the law applicable to the case, i.e., that the Commission on Retirement, Removal and Discipline of Judges (hereinafter Commission) has no jurisdiction to hear this case. I agree that there is not one line of evidence in the record to support the alleged charges against Judge Voorhees. The principal opinion having so correctly and properly concluded that under our Constitution the Commission is not the proper entity to deal with the breakdown, I read and reread the opinion searching for guidance as to how this Court is going to deal with solving the St. Louis County judicial breakdown. Finding no such guidance, and finding a number of purported conclusions and statements with which I cannot agree, and seeing omissions which I deem vitally important to determination of this case, and, which leave unexposed what I believe to be one of the basic underlying causes of the Twenty-First Judicial Circuit problem, precludes me from lending my name to more than the limited result of the opinion.

In February 1985 in *Gregory v. Corrigan,* 685 S.W.2d 840, 845 (Mo. banc 1985), (Welliver, J. dissenting) I stated with reference to the Twenty-First Circuit problem, "[t]his is no time for half solutions." Two and one-half years later, I now suggest that a half solution today constitutes a total abdication of our constitutionally mandated duty to administer and run the courts. Mo. Const. art. V, §§ 4.1 and 8. This cause is not just a limited disciplinary proceeding against Judge Voorhees, it is the on-going problem of the Twenty-First Judicial Circuit. In this unique set of circumstances, we are not limited to the discipline issues only. It is our duty and obligation to deal with the broader continuing problem of the Twenty-First Judicial Circuit.

## I

The statement that the conduct of the associate circuit judges in passing around bottles of candy pills labeled "I Don't Give A Shit Pills" in ridicule of the orders issued by their superiors, "arguably represents an exercise of a First Amendment Right" of the associate circuit judges, offends both my understanding of the law and my sense of justice. In my view, the First Amendment does not bestow on the associate circuit court judges a right to give the citizens of St. Louis County "I Don't Give A Shit Pills" in lieu of the orderly administration of justice. Nor, can I participate in telling the citizens of St. Louis County that "[w]e [as a Court] deem this incident trivial," [this statement deleted from the principal opinion subsequent to original circulation of this opinion] when I know that it has in fact deprived them of their fundamental right to have an orderly administration of justice for the past several years.

## II

In some respects, the principal opinion is as notable for its omissions as it is for its length. Omitted from the principal opinion are many of the facts and details about how and why this charge is before the Commission.

Omitted is the fact that as long ago as May 20, 1983, we were at least informally advised that the Commission considered that it had no jurisdiction over the St. Louis squabble. The position of the Commission was as clearly and plainly stated as is the applicable law and the result obtained by the principal opinion.

> I don't think we should get in the middle of this squabble over how that court is to be run since I think that's completely outside our function and charge.
>
> It is my position that it is incumbent on the Presiding Judge of the St. Louis County Circuit Court, and the Chief Justice of the Supreme Court of this state to give directives to the judges of that Court, and if that is unavailing and the judges violate the direct orders of the chief administrative judge in this state, I think we should act.

Nor all your tears wash out one word of it.
O. Khayyam, Rubaiyat of Omar Khayyam 170 (E. Fitzgerald trans. 1952).

Letter dated May 20, 1983 from Judge Robert G. Russell, Judicial Member of the Commission to all Commission Members and to Chief Justice Albert L. Rendlen, circulated to all judges of this Court by Chief Justice Rendlen on May 24, 1983. *In The Matter of the Twenty-First Judicial Circuit,* No. 65081, not reported.

This Court first intervened into the St. Louis County judicial breakdown when we ordered and directed the Court of Appeals, Eastern District, to investigate and make recommendations for solving the matter. *In The Matter of the Twenty-First Judicial Circuit,* No. 65081, not reported. This resulted in there being sent to our Court majority and minority reports,[2] and, a resulting division of the court of appeals almost as well defined as that existing in the Twenty-First Judicial Circuit itself. The majority report was filed by Presiding Judge Stewart and Judge Gerald Smith, the minority report by Judge Robert Dowd. The failure of this constitutionally authorized delegation[3] of authority by our Court to the Court of Appeals to deal with the problem was obvious from the time of the filing of those reports. With the filing of the reports, the ball was returned to this Court where I believe it has remained, either poorly played, halfplayed or unplayed until this moment.

To the extent discussed by the principal opinion, the continuing proceedings in our Court are accurately described. Omitted from the principal opinion are those matters that would make far more clear and understandable the beginnings of these proceedings before the Commission, some of which are found in the transcripts of this hearing, and, some of which were found in an envelope in the file marked "Exhibits I, J, K & L, deposited by Resp[ondent] [Voorhees]." These exhibits were rejected at hearing before the Commission, ordered by this Court filed in this proceeding on May 28, 1987, and deposited in this Court's file

June 2, 1987. There appears on the sealing tab side of the envelope a handwritten entry: "Opened and inspected by Blackmar, J., 6–22–87 1:45 p.m. and resealed in presence of Beth McHaney" (Deputy Clerk).[4] Attached and appended hereto as Appendix 1. Understanding the full implications of this proceeding requires full and open disclosure of these exhibits. Pertinent parts are attached and appended hereto as Appendix 2, pages 202–206, and 205; Appendix 3, Appendix 4, and Appendix 5, page 207.

Respondent's Exhibit I, marked as Appendix 2, pages 202 and 203, (names of judges deleted) reflects that Respondent Voorhees' predecessor, Presiding Judge William Corrigan, on March 15, 1985, a year before the charges were filed against Judge Voorhees, filed a complaint against five associate judges. The Commission, by letter of August 2, 1985, Appendix 3, replied that the Commission had no jurisdiction over administration of courts. The Commission apparently ignored the fact that the complaint made was that the associate judges, in disobedience of administrative orders, had failed to turn over bank accounts over which individual associate judges had control. Article V, § 24.3 of the Missouri Constitution provides that "wilful neglect of duty" is a ground for discipline including removal from office.

It is of interest to note that the record reflects that as much as $500,000 of bank accounts may have been involved, many accounts being interest free accounts. It is also of interest to note that Presiding Judge Corrigan's report of the judges to the Commission was several months prior to our holding in *In re: Rules of Circuit Court for the Twenty-First Judicial Circuit,* 702 S.W.2d 457 (Mo. banc 1985), in which we suggested reporting judges to the commission for failure to carry out duties be considered as an alternative in accordance with the Guidelines of the Pre-

---

**2.** I am unable to locate copies of those reports showing that they were filed in No. 65081 or any other file, but they were received by the Court and circulated to all judges.

**3.** Mo. Const. art. V, §§ 4.1 and 8.

**4.** That envelope now includes on the sealing tab side a second handwritten statement reading: "Opened and copies made 7–27–87 (July). Welliver, J."

siding Judge's Handbook. Also, it is of interest to note that substantially the same complaint was filed with then Chief Justice Albert Rendlen. Appendix 2, pages 203–204.

It was in this background that on March 17, 1986, the Commission notified Presiding Judge Voorhees that complaints had been made against him by reason of his having issued his February 27 orders ordering Associate Circuit Judges Gerhart, Goeke, O'Toole, and Quillin to get out of their offices, which he said was for the purpose of assigning judges who would handle the dockets. Commission Exhibit 8, attached and appended hereto and marked as Appendix 6. No reference is made to this notice in the principal opinion. The notice does not say specifically who filed the charges. The charge stated that Judge Voorhees had wrongfully issued the orders against the four named associate circuit judges, that the facts in the orders were false, that Judge Voorhees had acted in excess of his authority and that the orders constituted discipline, making it obvious as to who the real parties in interest were. The same four judges had, as the principal opinion states, on February 28, 1986, brought the same complaints to our Court. We stayed the orders and directed the four judges to comply with directions of the presiding judge. Apparently dissatisfied with our staying the orders and our backing the presiding judge, they sought what might prove to be a more friendly forum[5] in which to seek relief and in effect to review our action.

Judge Voorhees' response was delayed by reason of his attorney being absent, but on April 11, he responded substantially as his testimony is reflected in the principal opinion. See Commission Exhibit 9. The exhibit included the signed statement of thirteen circuit judges, a majority of the circuit judges, stating that they had authorized Judge Voorhees to issue the orders to the four associates.

On July 14, 1986, the Commission served notice on Presiding Judge Voorhees that they had voted and ordered a cease and desist order against him. Commission Exhibit 10, attached and appended as Appendix 7. [Footnote 1 to the principal opinion was added subsequent to the original circulation of this opinion.] No mention is made in the principal opinion about this cease and desist order. Judge Voorhees was ordered to cease and desist from ever entering orders like the orders issued to the four associate judges.

After responding to the Commission as he had before responded, Commission Exhibit 11, the Commission on September 28 notified Judge Voorhees, Commission Exhibit 12, attached and appended as Appendix 8, that

[i]f the cease and desist order in subparagraph (b)2 [Rule 12.08] is issued the person under investigation shall either;

(a) Agree in writing to comply with the order in which case the complaining party shall be notified of such action;

(b) Refuse to agree in writing to comply with the order, in which case formal proceedings shall be instituted.

Respondent Voorhees' then attorney, F. William McCalpin notified the Commission that "Judge Voorhees will not either directly or indirectly admit that his Orders violated any canon of judicial ethics or any Supreme Court Ruling." Commission Exhibit 13.

The Commission then issued its notice and order of hearing dated December 5, 1986, which is discussed in and substantially set forth in the principal opinion. Commission Exhibit 14. The original charges, the cease and desist charges that Judge Voorhees had issued orders in excess of his authority, were abandoned. In the Notice of hearing, Judge Voorhees was charged with a new charge, i.e. failing to report to the Commission misconduct of the four associate judges. Hearing was set for January 28, 1987.

---

**5.** *See* minority report, *In The Matter of the Twenty-First Judicial Circuit,* No. 65081, not reported.

At this point, looking at and understanding Judge Voorhees' alternatives becomes vitally important to understanding the full implications of this proceeding.

## Alternative I

Being only 25 days away from the end of his term as Presiding Judge, Judge Voorhees, easily and truthfully, could have agreed to forbear ever making any such orders again. Under our rules, the matter would at this point be secret from the public. There would be no hearing, no court expense, no legal fees, and no public besmirching of his professional name. Judge Voorhees would incur only the personal hurt resulting from receiving the original communications, and, knowing that the four associate judges would either learn directly or indirectly that he had acceded to and agreed to the cease and desist order issued by the Commission. Judge Voorhees, I am sure, was not unaware that if he agreed, it would be whispered through the halls of the St. Louis County courthouse that the associates had won a major round in their unceasing fight to select the presiding judge, and, that the Supreme Court had been out-maneuvered and out-flanked. In addition to the personal hurt, Judge Voorhees would have to know in his own heart that either he had abandoned his principles, or, as so many might rationalize, bent them a little to save the expense of the fight.

## Alternative II

He could refuse to agree to the cease and desist order; stand unintimidated; risk the personal hurt to himself and his family; spend months going through the hearing and appeal; spend a large sum of his life savings for legal fees and expenses; go it alone every mile of the way, wondering when or if the Missouri Supreme Court would see fit to back him up.

We are all aware of the choice of alternatives made by Judge Voorhees.

The principal opinion only mentions the fact that Judge Voorhees' predecessor Presiding Judge Corrigan, and his successor

Presiding Judge Drumm, on March 19, 1986, just one or two days after Judge Voorhees was notified of the original charges made against him, filed copies of the transcript, of the Organizational Committee Hearing of February 21, 1986 with the Commission as their report to the Commission of misconduct of the associates. *Voorhees* 739 S.W.2d at 188. To show how the Commission handled these reports, I attach Exhibit K marked Appendix 4, Letter from Corrigan to Commission; Exhibit L marked Appendix 5, p. 207, Letter Drumm to Commission, p. 207, Letter Commission to Drumm, and p. 207 Letter Drumm to Commission. The transcript itself, primarily the testimony of the clerks of the Twenty-First Circuit, paints a picture, already partially painted by the press, by the Commission's findings and by the findings of the principal opinion, of insubordination and childishness unequaled in Missouri judicial history. Respondent's Exhibit A.

Simply stated, the matters omitted from the principal opinion which I have set forth make it impossible for me to join in the statement of the principal opinion that "[w]e [the Court] do not doubt the Commission's good faith in making this recommendation." [This statement deleted from the principal opinion subsequent to original circulation of this opinion.] It is the omitted matters that make it impossible for me to join in the statement "[n]or do we [the Court] intimate that a solution such as they propose might not commend itself to a reasonable person." [This statement deleted from the principal opinion subsequent to original circulation of this opinion.] Were I to concur in such statements, I would stand compromised and intimidated.[6]

## III

The author's treatment in the principal opinion of the trip of Judge Voorhees and his organization committee members to Jefferson City on February 25, 1986 to seek the help and advice of Chief Justice Higgins concerns me deeply. As I read it, it is

6. *See Sprung v. Negwer Materials, Inc.*, 727 S.W. 2d 883, 894, 900 (Mo. banc 1987).

my impression that they sought and did not find help, except perhaps being verbally assured "that the Supreme Court would back the circuit judges up in their enforcement of the rules made by their authority pursuant to art. V, § 15.1," *Voorhees,* 739 S.W.2d at 182, an assurance rendered questionable on its face by this Court's vacillations. Earlier a similar appeal had been made by Judge Corrigan in a letter to Chief Justice Rendlen. Exhibit I, Appendix 2, pages 203 and 204.

Article V, § 8 of the Missouri Constitution states:

The chief justice of the supreme court shall be the chief administrative officer of the judicial system and, subject to the supervisory authority of the supreme court, shall supervise the administration of the courts of this state.

(Emphasis added.) This part of section 8 was added by the constitutional amendments of 1976 which were directed at unifying our courts. The underlined portion replaced the words that "they shall also perform any other duties prescribed by their respective courts." Mo. Const. art. 5, § 8 (1970, amended 1976). Clearly, the change called for a new and stronger concept of judicial leadership by Chief Justices. The statement that "[t]wo of the judges testified that the possibility of relieving an uncooperative judge might have been discussed, but it is clear that the Chief Justice was not asked to, and did not authorize the relief order of February 27, 1986," *Voorhees,* 739 S.W.2d at 182. (footnote omitted), can only be responded to by my saying, if he did not, he should have. Their calls for help should have been answered with action. Had this Court ordered the judges in to replace the dissident associates, all of this proceeding and its attendant delays could have and would have been avoided. The Constitution as amended mandates and calls for strong leadership by Chief Justices. Mo. Const. art. V, § 8.[7]

## IV

The principal opinion at no place answers the question whether a presiding judge, such as Judge Voorhees, has the power to issue the orders which he issued. Perhaps it is so clear that in multiple judge circuits the presiding judge, or we, can order in outside judges to take care of necessary judicial business, and, that judges have no prescriptive rights to the courtrooms, that it requires no further comment. In any event, our past experience in this area speaks strongly in favor of eliminating all doubts on all issues. Missouri statutes provide:

2. Subject to the authority of the supreme court and the chief justice under article V of the constitution, the presiding judge of the circuit shall have general administrative authority over all judicial personnel and court officials in the circuit, including the authority to assign any judicial or court personnel anywhere in the circuit, and shall have the authority to assign judges to hear such cases or classes of cases as the presiding judge may designate, and to assign judges to division.

Section 478.240.2, RSMo 1986. I believe we should state clearly and unequivocally that a presiding judge, subject to the supervisory authority of a majority of the circuit judges, does have such power and authority.

## V

Much has been said and written in the principal and in this concurring opinion about the Commission exceeding its jurisdiction in this matter. I believe that substantial credence could be added to our opinion if, at the same time, we would honestly and fairly examine the cleanliness of the hands of the remainder of the players, particularly our own.

This Court in early January had an opportunity to put this aspect of the Twenty-First Circuit problem to rest without either

---

7. Should anyone consider concurring in this concurring opinion, it is agreed and understood by me that by so doing, he does not commit himself as embracing this concept without ex- pressly so stating, the views expressed in this point as to how the office of Chief Justice be administered, being solely my own.

publicity, fanfare or further delay. This Court today does not have before it a shred of determinative evidence that we did not have before us on January 5, 1987. We had substantially everything we have today, as exhibits, pleadings and affidavits in the many prior proceedings of the past four years and five months.

On January 5, 1987, Judge Voorhees brought to this Court in camera his petition for a writ of prohibition to prohibit the Commission from exceeding its jurisdiction and proceeding against him. This petition for prohibition was denied by the Court on January 16, 1987. The clerk advises me that no file was made in the clerk's office regarding this petition and our action thereon.

The Commission's filing of its recommendation for discipline in this Court, made all matters relevant to and pertaining to this disciplinary action a matter of public record.[8] The confidentiality belongs to the person against whom the complaint is made, not to the Commission or to the Court. The very heart of respondent's defense is that the Commission was without authority or jurisdiction to proceed against him, that a motion to dismiss should have been sustained or a writ of prohibition granted. While the Court pursuant to Rule 12.23 could order a matter held "in camera" until such time as the Commission files a recommendation of discipline in this Court, it is almost mind boggling to think that this procedure would be accomplished in a court of record by not making or creating a file. In camera means "in chambers," not secret proceedings without records thereof.[9] Under these circumstances, I am attaching from my file a copy of the Petition For Writ of Prohibition, (12 exhibits attached thereto omitted) as Appendix 9, and a copy of our January 16, 1987 order of denial, as Appendix 10.

Our denial of the petition for writ of prohibition made this Court as guilty as the Commission for putting Judge Voorhees through this long and expensive ordeal and more important, the some eight or nine months' delay in reaching a solution to the problems of the Twenty-First Judicial Circuit.

## VI

So long as this Court can, through its opinions, lull the public into believing each opinion is a final solution, and, that all is well, that all is in "good faith," and, that all that is done is "reasonable," the dissension in the Twenty-First Judicial Circuit will continue. The more than four years and five months that have expired since our reluctant entry into the fray is proof of this premise.

The manner by which this Court deals with the Commission in this case can be vitally important to the long term solution of the Twenty-First Circuit problems. The very fact that the associates seek relief before the Commission rather than by petition in this Court suggests that this is true. The fact that associates reporting a presiding judge gets favorable response from the Commission while presiding judges reporting associates falls on deaf ears, suggests that this is true. The Commission's abortive effort to control the presiding judge through a cease and desist order, the change in charges when this failed, and the effort to tell us how to administer the courts through their Recommendation No. 2 (by sending in an outside judge), which had absolutely nothing to do with the substituted charge against Voorhees, all on the face of the record, suggest that the Commission in fact has become a part of the problem in the Twenty-First Circuit.

Indulgent and permissive handling of the Commission in this matter by the author of

---

8. (a) All papers filed in proceedings before the Commission shall be confidential unless and until the Commission files a recommendation with this Court that the judge member of a judicial commission or of this Commission be retired, removed, or disciplined.
 Rule 12.23(a).

9. 6 Temple Law Quarterly 381, 1932; § 455.030, RSMo 1986 (adult abuse); § 491.015.3, RSMo 1986 (witness' sexual conduct); § 491.680, RSMo 1986 (alleged child victims); § 643.600, art. VIII, RSMo 1986 (trade secrets, Kansas-Missouri Air quality Compact); Rule 24.02(d)(2) (plea agreements); Rule 25.11(C) (misdemeanors of felonies-protective orders.

the principal opinion cannot do other than raise false hope in the minds of the associates. Having before us conduct of the associates such as is described in the transcript of this proceeding and then coddling the associates as is done in footnote 5, [the original footnote 5 was deleted from the principal opinion subsequent to the original circulation of this opinion] can only raise false hopes higher.

In light of our opinion in *In re: Rules of the Circuit Court of the Twenty-First Judicial Circuit,* 702 S.W.2d 457 (Mo. banc 1985), our failure to at least comment on H.B. 222, 1st Reg.Sess., 84th Gen. Assembly cannot be interpreted by the associates as other than an open invitation to come back and litigate the bill at some time in the future.

Since our mention of the possibility of sending someone in to run the Twenty-First Circuit in *In re: Rules of the Circuit Court of the Twenty-First Judicial Circuit,* 702 S.W.2d 457, 460 (Mo. banc 1985), the associates, in every subsequent proceeding before our Court, either by motion or pleading, have requested that we take such action. The eternal hope reflected in these motions and pleadings together with the Commission's recommendation that we take such action suggests that such procedure apparently is viewed as creating a favorable arena in which to politic for a favorable appointee. For this Court to adopt such a procedure at this late date would be as wrong as it might have been appropriate two and one-half years ago. The lateness of the hour; the failure of our attempt to delegate solution of the problem to the Court of Appeals; the total failure of our delegation to the Commission by default; and, the passage of over four years leaves no choice for this Court other than to act promptly and effectively to resolve this problem. The result of the principal opinion only tells the bar and the people of Metropolitan St. Louis that the Commission is not the proper party to deal with this problem. It is totally appropriate that after waiting for a solution for more than four years the bar and the people of

St. Louis should ask, "Who will resolve it, and, when?"

Our Constitution provides:

**Section 4. Superior courts to control inferior courts—courts administrator, salary—reapportionment commission, appointment.** 1. The supreme court shall have general superintending control over all courts and tribunals. Each district of the court of appeals shall have general superintending control over all courts and tribunals in its jurisdiction. The supreme court and districts of the court of appeals may issue and determine original remedial writs. Supervisory authority over all courts is vested in the supreme court which may make appropriate delegations of this power.

Mo. Const. art. V, § 4.1.

The Constitution further provides:

**Section 8. Chief justice and chief judges, election, terms—authority of chief justice.** The judges of the supreme court shall elect from their number a chief justice to preside over the court en banc, and the judges of the court of appeals in each district shall elect from their number a chief judge of the district. The terms of the chief justice and chief judges shall be fixed by the courts over which they preside. <u>The chief justice of the supreme court shall be the chief administrative officer of the judicial system and, subject to the supervisory authority of the supreme court, shall supervise the administration of the courts of this state.</u>

Mo. Const. art. V, § 8 (emphasis added).

After more than four years and five months, we have no choice but to acknowledge that the ball has been far too long in our Court.

This opinion should make clear that there no longer exists any hope for anyone to politic for a favorable appointee to be delegated by this Court to run the Twenty-First Circuit.

This opinion should carry a clear message to the associates that the circuit judges, through a presiding judge elected by a majority of the circuit judges, are going to run and administer the Twenty-

First Circuit. To give credence to our opinion and to remove all doubts, I believe that this opinion needs to carry a message to the associates that this Court has confidence in and the highest respect for Judge Voorhees' successor Judge Bernhardt Drumm. We recognize Judge Drumm as F.B.I. trained and as a man who has always demonstrated the fairness and justice exemplified by his prior training and service. He has always demonstrated his dedication to the legal profession and the judiciary. We expect him, subject to the approval of the majority of the circuit judges, to carry out the duties of the office of presiding judge with the complete backing of this Court.

In view of the record before us and the fact that the Twenty-First Circuit is not on our computer filing, but rather on a system called REJIS, I believe, for the short run, we should ask the Presiding Judge of the Twenty-First Judicial Circuit to forthwith and monthly thereafter until further order, send to the Courts Administrator computer print-outs of all dockets of the Twenty-First Circuit together with any information he may have about presently unresolved cases or missing court files.[10] With the assistance of prosecuting officials any questions regarding missing or unresolved files can be clarified and resolved promptly by this Court. For the long term, I believe we should invite the Presiding Judge of the Twenty-First (and Twenty-Second) Circuit to take steps to have their staffs cooperate with our State Courts Administrator in planning toward the goal of getting these two circuits on the state computer record system. Also, we should invite their special efforts to work with our Courts Administrator toward getting all of the associate circuit judge records of the state on the same computer record filing system as the circuit judges of the state.

Some of the testimony of the clerks appearing in the transcript of the Organization Committee meeting indicates that for any order to be understood and followed by the associate judges, it requires the Presiding Judge to "dot the i's," use "small words," "running on what equals the basic kindergarten level," "so even my grandchild could understand." If this is true, and four years and five months of continual questioning of our orders suggests that it is, then perhaps there should be added a caveat—that we feel and expect that this case should be the last chapter of this sordid ordeal, and, that events of the past four years and five months leave us with a strong leaning toward strict construction of those provisions of Mo. Const. art. V, § 24 that authorize discipline, including removal from office, for "misconduct," "wilful neglect of duty" or "incompetency."

I would further suggest that the time required to arrive at the associate judges' goal of being classified as circuit judges, the final step in achieving a totally unified court system, is a distance in the future which is in direct proportion to the associates' willingness to demonstrate their ability to work harmoniously in an integrated multi-level court system.

My sense of justice and what I perceive to be my obligation to the almost four hundred judges in Missouri, whose conduct is reviewable by the Commission, compels me to add that the four volumes of transcript paint a picture of intimidation of witnesses, including judges, which was neither contemplated by people in creating the Commission nor is it deserved by the judges or other witnesses appearing before the Commission. Such intimidation of witnesses has no place in the Missouri judicial system and cannot do other than render the inquiry of the Commission suspect.

In my opinion, Respondent Judge Voorhees should be invited to file a Motion For Allowance of Fees and Expenses to be assessed against the Commission.

If breaking the veil of secrecy can make the people aware of the true achilles heel of the Missouri Non-Partisan Court Plan, its built-in propensity to replace partisan politics with judicial politics, a form of poli-

10. Both the transcript of the Organization Committee meeting, Respondent's Exhibit A, and the media reporting, have suggested that the unre-
solved files are primarily traffic and DWI case files.

tics which I deem to be far more dangerous and sinister than partisan politics, then my limited service on this Court will not have been in vain.

Perhaps breaking the veil of secrecy and letting in the light of public scrutiny can be a first step toward creating a judiciary where the Supreme Court, the Courts of Appeals, and the Commission are constituted of people of the same high principles, courage, intestinal fortitude, and independence as the judge before us today.

APPENDIX 1

APPENDIX 2

Respondent's Exhibit I

Circuit Court of St. Louis County

Courts Building

Clayton, Missouri 63105

William M. Corrigan

Presiding Judge

March 15, 1985

Godfrey P. Padberg, Esq.

Chairman, Commission on Retirement and Removal of Judges

1015 Locust Street

St. Louis, Missouri 63101

Dear Mr. Padberg:

As Presiding Judge of the 21st Judicial Circuit, I issued the attached administrative order under date of January 24, 1985, which is self-explanatory. Prior to that, I issued the attached order dated December 5, 1984, and attached thereto is a copy of bank reconciliations of the thirteen (13) Associate Circuit Judges of this circuit.

Subsequent to the January 24, 1985 order, eight (8) Associate Circuit Judges, in compliance with that order, transferred all their bank receipts and all future monies collected by them to the Circuit Clerk of this circuit. Five (5) Associate Circuit Judges, namely, Judges, ———, ———, ———, ——— and ———, refused to comply with said order.

Demand was made on them on March 7, 1985, to turn over their bank accounts and future receipts to the Circuit Clerk by March 8, 1985. They have refused to comply with this order.

For your convenience, I am attaching correspondence from each of them concerning this matter, together with my correspondence to the Chief Justice of the Missouri Supreme Court. Although I have received no reply from the Chief Justice, the matter of accounts was discussed in the recent case of Gregory et al. vs. Corrigan et al.

I realize that the Court has within its power certain formal legal proceedings, including contempt, by which it could pro-

ceed. I believe that it would not be in the best interest of the judiciary to proceed in that matter. Hence, in spite of my great personal reluctance to formally complain to you, my public responsibility as Presiding Judge demands that I do so.

Although there has been constant recalcitrance in this circuit for some period of time, I have not seen fit to use this remedy. I cannot, however, tolerate the continued violation of lawful orders issued by the Presiding Judge. There has been no legal proceeding taken by the five (5) Associate Circuit Judges other than a refusal to comply. In my judgment, the public interest has been damaged by their continued insubordination. It is for that reason, and that reason only, that I turn to you in your official capacity to take whatever action you feel is necessary to see that judges who refuse to recognize the authority of the Presiding Judge, honor that authority in accordance with appropriate judicial ethics.

I will cooperate with you in any way that you so desire.

Very truly yours,
/s/William M. Corrigan
Presiding Judge

Circuit Court of St. Louis County

Courts Building

Clayton, Missouri 63105

William M. Corrigan

Presiding Judge

February 5, 1985

Honorable Albert L. Rendlen

Chief Justice of the Supreme Court

Supreme Court Building

P.O. Box 150

Jefferson City, Missouri 65102

In Re: Administrative Order 1–85

Dear Chief Justice:

In compliance with my attached Order of December 5, 1984, the Associate Circuit Judges delivered to me their bank records for the year 1984. Subsequently, these accounts were analyzed by the County Auditor, a copy of which is attached.

On January 3, 1985, I met with Judge Eberwein, the Associate Presiding Judge, and discussed with him the problems inherent in that bank analysis. I advised him that good business management, fiscal responsibility and the public interest mandated that these funds be turned over to the Circuit Clerk for appropriate investment.

He agreed to present this matter to the Associate Circuit Judges and advise me of their response. Although we had subsequent meetings, it became apparent to me on January 24, 1985, that no remedial action was forthcoming. Hence, I issued the attached Order of January 24, 1985. That Order was followed by the response of Judge Eberwein of January 31, 1985, and my response of the same date, both of which are attached and are self-explanatory.

To this date, eight Associate Circuit Judges have turned over their funds to the Circuit Clerk in accordance with Order 1–85. Five Associate Circuit Judges namely: Judges Clifford, Gerhard, Goeke, Gregory and Quillin, have refused to do so. Attached are letters written by Judge Goeke, Gerhard and Clifford which are, again, self-explanatory.

Although I recognize that the appropriate formal procedure would be a Petition For Review, I do not believe it would be in the best interest of the judiciary that this matter be aired in such a formal proceeding. As an administrative matter, I believe it comes within the supervisory authority of the Supreme Court and within your authority as the chief administrative officer of the judicial system of this state. Therefore, I am submitting the above information and data to you for whatever appropriate action you wish to take under the authority vested in you.

Although I have long been cognizant of my responsibility as Presiding Judge to settle disputes at the local level, the various enclosures point out that that is impossible. As distasteful as it may be, it is necessary that I ask you to intervene in this matter. If your intervention is not feasible, I would appreciate a prompt re-

sponse so that I may take the necessary formal steps to carry out my responsibility in this matter as diligently as possible.

Very truly yours,
/s/William M. Corrigan
Presiding Judge

P.S. Enclosed at the time of mailing is a letter from Judge Gregory.

STATE OF MISSOURI )
 ) ss.
COUNTY OF ST. LOUIS )

In the Circuit Court of the County of St. Louis State of Missouri

December 5, 1984

## ORDER

In order for the Presiding Judge to ascertain the accounting practices and the monetary policy of the divisions presided over by Associate Circuit Judges, it is hereby ordered that on or before December 15, 1984, each Associate Circuit Judge deliver to the Presiding Judge:

1. Copies of all bank statements of all checking and savings accounts for the year 1984;

2. Any and all evidence of any certificates of deposit or any other type of investment of funds;

3. A statement of the amount of interest received on any and all accounts and/or investments during the calendar year, 1984.

4. A statement of the disposition of that interest;

5. A copy of all financial records, other than bank accounts, that are maintained by each Associate Circuit Judge.

/s/William M. Corrigan
Presiding Judge

| NAME OF BANK | ACCOUNT NUMBER | TYPE OF ACCOUNT | BALANCE | INTEREST EARNED | INTEREST RATE | AVERAGE BALANCE | HIGH BALANCE | LOW BALANCE |
|---|---|---|---|---|---|---|---|---|
| 1 COMMERCE BANK ST LOUIS COUNTY | 323-201-2 | F&B CK | $15,268 | $0 | 0 | $14,167 | $19,372 | $7,934 |
| CENTERRE BANK FLORISSANT | 710-028 | I CK | $2,043 | $881 | 5.5 | $1,580 | $2,043 | $1,223 |
| BANK TOTAL | | | $17,311 | $881 | | $15,749 | $21,415 | $9,057 |
| 2 COMMERCE BANK ST LOUIS COUNTY | 411-086-8 | F CK | $9,908 | $0 | 0 | $6,225 | $11,246 | $2,575 |
| | 92152-8 | B SV | $6,670 | $442 | 5.5 | $6,885 | $9,040 | $5,090 |
| | 191332-2 | I SV | $1,996 | $77 | 5.5 | $1,888 | $1,996 | $1,733 |
| BANK TOTAL | | | $10,574 | $518 | | $14,998 | $22,282 | $9,398 |
| 3 BRENTWOOD BANK | 219-515-3 | F CK | $10,511 | $0 | 0 | $10,632 | $17,164 | $4,080 |
| | 219-614-2 | B CK | $6,010 | $0 | 0 | $10,575 | $19,673 | $619 |
| | 4-546-1 | B SV | $11,510 | $584 | 5.5 | $11,559 | $12,387 | $11,094 |
| BANK TOTAL | | | $28,031 | $584 | | $32,765 | $49,225 | $15,793 |
| 4 LANDMARK BANK SOUTH COUNTY | 0002312 | F CK | $10,464 | $0 | 0 | $11,263 | $16,161 | $8,157 |
| | 000720 | B CK | $15,431 | $0 | 0 | $13,150 | $17,973 | $8,433 |
| | 70009044 | B SV | $12,851 | $520 | 5.5 | $12,600 | $12,851 | $12,331 |
| BANK TOTAL | | | $38,745 | $520 | | $37,013 | $46,985 | $28,921 |
| 5 1ST NATL BANK ST LOUIS COUNTY | 16-226-1 | F CK | $2,409 | $0 | 0 | $3,096 | $3,751 | $2,309 |
| | 13-178-0 | C SV | $7,749 | $0 | 0 | $8,529 | $25,520 | $2,995 |
| | 13-178-0 | B SV | $3,618 | $178 | 5.5 | $3,528 | $3,618 | $3,440 |
| | 369709 | B SV | $1,636 | $1,883 | 14.05 | $1,446 | $2,576 | $877 |
| BANK TOTAL | | | $15,412 | $2,061 | | $16,600 | $35,465 | $9,621 |
| 6 COMMERCE BANK NORTH COUNTY | 1-0-1088-4 | F CK | $15,414 | $0 | 0 | $17,632 | $31,459 | $6,896 |
| | 20-0133-5 | B SV | $29,498 | $1,452 | 5.5 | $28,765 | $29,498 | $28,046 |
| BANK TOTAL | | | $44,911 | $1,452 | | $46,397 | $60,956 | $34,941 |
| 7 COLONIAL BANK | 2088428 | F CK | $1,576 | $0 | 0 | $1,470 | $2,297 | $395 |
| | 2087572 | B SV | $31,675 | $1,432 | 5.5 | $32,591 | $35,147 | $26,584 |
| BANK TOTAL | | | $33,251 | $1,432 | | $34,061 | $37,443 | $26,979 |
| 8 COMMERCE BANK KIRKWOOD | 00 876 9 | F CK | $6,445 | $0 | 0 | $5,596 | $6,076 | $3,010 |
| | 19-0780173 | B SV | $28,587 | $2,456 | 5.5 | $33,809 | $43,390 | $20,675 |
| BANK TOTAL | | | $35,032 | $2,456 | | $39,405 | $49,456 | $23,685 |
| 9 ROYAL BANK MID-COUNTY | 43511200 | F CK | $616 | $0 | 0 | $1,288 | $2,542 | $551 |
| | 43510400 | B CK | $50,210 | $2,027 | 5.5 | $40,504 | $52,994 | $27,419 |
| BANK TOTAL | | | $50,876 | $2,027 | | $41,792 | $55,536 | $27,470 |
| 10 LANDMARK BANK LADUE | 11007630 | F CK | $6,793 | $0 | 0 | $4,085 | $10,803 | $297 |
| | 11007622 | B CK | $18,219 | $0 | 0 | $9,477 | $18,219 | $2,094 |
| | 200184-4 | B SV | $27,233 | $1,125 | 5.5 | $27,354 | $34,129 | $26,129 |
| BANK TOTAL | | | $52,245 | $1,125 | | $40,915 | $63,151 | $28,520 |
| 11 COMMERCE BANK ST LOUIS COUNTY | 362-076-3 | F CK | $26,813 | $0 | 0 | $1,032 | $2,681 | $9 |
| MERAMEC VALLEY BANK | 15-006-19 | B CK | $10,304 | $0 | 0 | $16,595 | $23,755 | $6,398 |
| CD ISS 2/18/82 MAT 8/12/84 REN82-0702159 | | B SV | $0 | $460 | ? | $0 | $0 | $0 |
| CD ISS 2/18/82 MAT 8/16/84 REN6-102160 | | B SV | $0 | $230 | ? | $0 | $0 | $0 |
| PAS BOOK ACCOUNT | 1004898 | B SV | $13,026 | $660 | 5.5 | $13,026 | $13,026 | $13,026 |
| PASS BOOK ACCOUNT | 517599 | B SV | $113 | $6 | 5.5 | $113 | $113 | $113 |
| BANK TOTAL | | | $50,256 | $1,356 | | $30,766 | $39,575 | $19,546 |
| 12 CENTRAL BANK CLAYTON | 4012169 | F CK | $3,562 | $0 | 0 | $2,462 | $3,562 | $1,060 |
| | 1019600 | B CK | $5,125 | $0 | 0 | $9,045 | $17,275 | $2,661 |
| | 4204174 | B SV | $2,400 | $123 | 5.5 | $2,928 | $3,527 | $2,323 |
| BANK TOTAL | | | $11,087 | $123 | | $14,435 | $24,364 | $6,044 |
| 13 LINDELL TRUST CO | 1759418 | F CK | $6,406 | $0 | 0 | $5,005 | $8,034 | $3,208 |
| COUNTY BANK RICHMOND HEIGHTS | 01-64798 | B CK | $14,043 | $0 | 0 | $10,608 | $15,361 | $6,500 |
| BANK TOTAL | | | $20,449 | $0 | | $15,613 | $23,395 | $9,708 |
| GRAND TOTAL | | | $382,898 | $13,101 | | $344,449 | $491,805 | $223,204 |

STATE OF MISSOURI )
) ss.
COUNTY OF ST. LOUIS )

In the Circuit Court of the County of St. Louis State of Missouri

January 24, 1985

## ADMINISTRATIVE ORDER NO. 1—85

An examination of the banking procedures now utilized in the thirteen Associate Circuit Divisions convinces me that a central depository of the Court funds would produce interest in cases where none is now generated, increase the return of interest and substantially reduce personnel time in the management of the accounts.

Effective February 1, 1985, it is hereby ordered that:

1. All bank accounts, certificates, cash and banking records presently maintained

in the Associate Circuit Divisions will be transferred to the Circuit Clerk together with copies of the reports furnished to the State Courts Administrator's Office or any other state agency for the month of January, 1985.

2. All cash bonds will be deposited with the Circuit Clerk.

3. All checks representing costs in civil actions will be deposited daily in the Circuit Clerk's Office.

It is further ordered that the Court en Banc will submit one unified budget for all thirty-three divisions for the year 1986. All Associate Divisions will submit budget estimates to the Budget Committee on or before July 1, 1985. The Budget Committee will review the budget estimates and report its recommendations to the Court en Banc.

Further, the Budget Committee will be charged with the responsibility of administering and monitoring the 1986 Budget.

/s/William M. Corrigan
Presiding Judge

APPENDIX 3

Respondent's Exhibit J
Commission on Retirement, Removal and Discipline

August 2, 1985

Honorable William Corrigan
St. Louis County Circuit Court
7900 Carondelet
Clayton, Missouri 63105
Dear Judge Corrigan:

Please be advised that the Commission on Retirement, Removal and Discipline has completed its investigation of your complaint against Judges _____ and others. The Commission does not have authority to consider a complaint concerning a judicial error, mistake in the application of the law or other legal reasons for appeals. The Commission cannot review judicial decisions because such is the sole role of the State Appellate Courts. Also, the Commission does not supervisory authority over any Court administration matters. Violations of the Code of Judicial Conduct are the only matters over which the Commission has authority to discipline a judge.

After investigation, the Commission voted that it did not have jurisdiction over your complaint. Consequently, the file has been closed.

Yours very truly,
/s/James M. Smith
Administrator and Counsel

APPENDIX 4

Respondent's Exhibit K

WILLIAM M. CORRIGAN

JUDGE OF THE CIRCUIT COURT

OF ST. LOUIS COUNTY

CLAYTON, MISSOURI 63105

March 19, 1986

Commission on Retirement, Removal and Discipline
Godfrey Padberg, Chairman
1015 Locust Street
St. Louis, Missouri 63101
Gentlemen:

Enclosed please find one copy of the transcript of proceedings held February 21, 1986, before the Reorganization Committee of the Twenty-First Judicial Circuit. As you might expect, it is with some trepidation that I forward this enclosure, but my responsibility under Supreme Court Rule 2, Cannon 3, B(3) takes precedence over my personal feelings.

This matter is being forwarded to you for your consideration as to what action, if any, you wish to take.

Very truly yours,
/s/William M. Corrigan

APPENDIX 5

Respondent's Exhibit L

BERNHARDT C. DRUMM, JR.

JUDGE OF THE CIRCUIT COURT

OF ST. LOUIS COUNTY

CLAYTON, MISSOURI 63105

March 19, 1986

Commission on Retirement, Removal and Discipline

Godfrey Padberg, Chairman

1015 Locust Street

St. Louis, Missouri 63101

Gentlemen:

Regrettably, enclosed for your consideration, pursuant to Missouri Rule of Court 2, Canon 3, B(3) and the February 28, 1986 Order of the Supreme Court of Missouri In re Administrative Orders of the Presiding Judge of the Twenty-First Judicial Circuit, cause number 67950, are one copy each of the Transcript of Proceedings held February 21, 1986, before the Reorganization Committee of the Circuit Court of the Twenty-First Judicial Circuit and the aforementioned Order of the Supreme Court dated February 28, 1986. The clerks who testified are supervisory personnel for the associate circuit divisions.

I forward this material only because my perception is that the Canons of Judicial Ethics require same.

Very truly yours,

/s/B.C. Drumm, Jr.

Commission on Retirement, Removal and Discipline

April 14, 1986

PERSONAL & CONFIDENTIAL

Honorable Bernhardt C. Drumm, Jr.

St. Louis County Circuit Court

7900 Carondelet

Clayton, Missouri 63105

Dear Judge Drumm:

This is to acknowledge receipt of your letter dated March 19, 1986 with the enclosed transcript of the reorganization committee meeting dated February 21, 1986. A copy of your letter and the transcript has been reviewed by all members of the Commission. At the conclusion of its review, the Commission voted to ask you whether your letter of March 19, 1986 was meant as a complaint against any judge. If your March 19 letter is a complaint, the Commission would appreciate your statement as to the judge or judges against whom you are complaining and a recitation of the precise conduct that you allege is a violation of the Code of Judicial Conduct. Also, please explain the extent and manner in which the testimony in the transcript supports your complaint.

Thank you for your attention to this matter.

Yours very truly,

/s/James M. Smith

Administrator and Counsel

BERNHARDT C. DRUMM, JR.

JUDGE OF THE CIRCUIT COURT

OF ST. LOUIS COUNTY

CLAYTON, MISSOURI 63105

April 16, 1986

Mr. James M. Smith

Administrator and Counsel

Commission on Retirement, Removal and Discipline

6933 Hampton Avenue

St. Louis, Missouri 63109

Dear Mr. Smith:

Receipt of your letter of April 14 is acknowledged. As stated in my letter of March 19, the material was submitted because, in my opinion, the Canons of Judicial Ethics require disclosure. It is the prerogative of the Commission to determine whether a violation has occurred. Further response by me would, in my opinion, exceed my duty and infringe upon the jurisdiction of the Commission.

Very truly yours,

/s/B.C. Drumm, Jr.

APPENDIX 6

Commission on Retirement, Removal
and Discipline

March 17, 1986

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Honorable Alphonso Voorhees

5 Fielding Road

Ladue, Missouri 63124

Dear Judge Voorhees:

Please be advised that the Commission on Retirement, Removal and Discipline has received a complaint against you concerning your issuance of an order on February 27, 1986 to Judges George R. Gerhart, Joseph A. Goeke, Daniel J. O'Toole and Dennis J. Quillin. The order in question states as follows:

"WHEREAS by act and deed you have demonstrated your unwillingness or inability to participate within the framework of the judicial system of this circuit;

NOW, THEREFORE, it is ORDERED that commencing March 3, 1986, at 8:00 a.m., you are relieved of all docket, case load and trial responsibility in this circuit and you are to relinquish control of your facilities including your courtroom and chambers until further order of the presiding judge."

It is further alleged that on February 28, 1986, upon application of Judges Gerhart, Goeke, O'Toole and Quillin, the Missouri Supreme Court issued a stay order against your order of February 27, 1986.

The complaint alleges that before or at the time you issued the order of February 27, 1986, you knew the following:

1. That the allegations contained in the first paragraph of said orders were and are totally false;

2. Such allegations were made by you without any discussion or notice to Judges Gerhart, Goeke, O'Toole and Quillin, and without affording those judges a hearing, and such allegations were made at a time when Judges Gerhart, Goeke, O'Toole and Quillin were attempting to assist you in the administration of the court;

3. That your orders were in excess of the authority of a presiding judge without authorization in law and were issued capriciously as a means of harrassing Judges Gerhart, Goeke, O'Toole and Quillin;

4. That your orders were usurpation of the constitutionally conferred power of the Commission on Retirement, Removal and Discipline of Judges and of the Supreme Court of the State of Missouri;

5. That your orders were in direct violation of each and all of the six guidelines set forth in the Guidelines From Presiding Judges Handbook No. 13;

6. Your orders, as made public by the news media, did irreparable damage to the judicial system, held such system and Judges Gerhart, Goeke, O'Toole and Quillin up to public ridicule and caused embarrassment and humiliation to Judges Gerhart, Goeke, O'Toole and Quillin and their families and caused irrevocable damage to the careers of Judges Gerhart, Goeke, O'Toole and Quillin.

Finally, the complaint alleges that your order of February 27, 1986 violated Supreme Court Rule 2, Canon 1, 2A, 3A(1), 3A(4) and 3B(3).

Under Supreme Court Rule 12, this is your opportunity to present whatever matters you may wish in way of explanation. Accordingly, the Commission would appreciate your response to these various allegations within fifteen days.

Yours very truly,
/s/James M. Smith
Administrator and Counsel

APPENDIX 7

Commission on Retirement, Removal
and Discipline

July 14, 1986

PERSONAL & CONFIDENTIAL

Honorable Alphonso Voorhees

5 Fielding Road

Ladue, Missouri 63124

Dear Judge Voorhees:

Please be advised that the Commission on Retirement, Removal and Discipline has re-

viewed your response to the complaint which has been filed against you. The complaint concerned your order of February 27, 1986 which purported to relieve four Associate Circuit Court judges of their dockets and duties. At the conclusion of its review, the Commission voted that it has disciplinary jurisdiction over administrative matters when such matters are in violation of Supreme Court Rule 2, Canon 3B(1), (2), or (3). Further, the Commission voted that there is probable cause to believe that your order of February 27, 1986, violated Supreme Court Rule 2, Canon 3B(1), (2) and (3).

Your order of February 27, 1986, has been reviewed by the Supreme Court and the Commission notes the following language in Justice Edward D. Robertson, Jr.'s Memorandum Concurring In Part and Dissenting In Part:

"On February 27, 1986, the Presiding Judge of the Twenty-First Judicial Circuit issued Administrative Orders to Associate Circuit Judges George R. Gerhard, Joseph A. Goeke, III, Daniel J. O'Toole and Dennis J. Quillin purporting to relieve the named associate circuit judges of their dockets and directing that they relinquish control of their courtrooms and chambers. This Court stayed these Administrative Orders by order on February 28, 1986. This Court's order directed the named associate circuit judges to 'carry out and perform all of the duties and functions of their office until further order of this Court' or until 'further order of the circuit judges acting through the Presiding Judge of the Twenty-First Judicial Circuit pursuant to this Court's Per Curiam in case No. 67397 [the October 11 decision].'

To the extent that this Court's order of February 28, 1986, prevented the Presiding Judge from enforcing his Administrative Orders of February 27, 1986, I concurred in the Court's order.

The fact remains that there is no constitutional or statutory authority in the Presiding Judge to order the removal of these associate circuit judges from their courtrooms and chambers and to relieve them of the dockets in *these* circumstanc-

es. Each of these movants is holding office according to the mandates of Mo. Const. art. V. The Presiding Judge holds no greater claim to his office than do the movants. A presiding judge is to 'have general administrative authority over the court and its divisions.' Mo. Const. art. V, § 15.3. Such power does not, in my view, include the power to suspend another judge from his judicial duties for the reasons expressed by the Presiding Juge. See *Graham v. Cannon*, 574 P.2d 305 (Okla.1978)."

It is clear to the members of the Commission that the order of February 27, 1986, was in err. Further, the order failed to abide by the procedure set out in Guideline No. 13 of the Guidelines from the Presiding Judges' Handbook. This, and other guidelines, were specifically set out in the Appendix to the Supreme Court's decision *In Re: Rules of the Circuit Court for the Twenty-First Judicial Circuit*, 702 SW2d 457, 462 (Mo banc 1985). The Commission has voted probable cause to believe that your order of February 27, 1986, violated Canon 3B(1), (2), (3) for failure to abide by the directives of Guideline No. 13. Those guidelines are as follows:

"In the event that another judge of the circuit refused a reasonable directive of the presiding judge, interferes with the effective operation of the court, abuses his judicial position, or violates the Judicial Canons of Ethics, the presiding judge should consider one or more of the following options:

1. Explain to the resisting judge the reasons for the directive or position taken and listen to the response. Reevaluate your position.

2. If the problem persists, determine the available alternatives. Discuss and evaluate the alternatives. Discuss and evaluate the alternatives with the resisting judge.

3. Discuss the position of both parties with the other judges and reevaluate your position.

4. Present the problem to the court en banc or a committee of judges for a recommendation, or establish a procedures within the circuit for resolving dis-

putes between judges and the presiding judge, such as requiring the resisting judge and the presiding judge to state in writing, within a reasonable time, his or her reasons for a position. Forward all to a higher authority such as a court committee, the court en banc, or the chief justice of the Supreme Court for final determination.

5. Report the resisting judge to the chief justice of the Supreme court for appropriate action.

6. Where the refusal is willful and continual, report the resisting judge to the Commission on Retirement, Removal and Discipline."

However, due to the fact that the Commission perceives your order as a good faith effort to resolve the continuing intermural bickering within the Twenty-First Judicial Circuit, the Commission has voted to dispose of this matter by issuing a cease and desist order in accordance with Supreme Court Rule 12.08B(2).

You are hereby ordered to follow the directives of the Supreme Court as outlined in the appendix of *In Re: Rules of the Circuit Court for the Twenty-First Judicial Circuit,* 702 SW2d 457 (Mo banc, 1985) and to refrain from any further attempt to relieve members of the Twenty-First Judicial Circuit of their duties by any means other than those specifically authorized by law. In accordance with Supreme Court Rule 12.08(b)(3), please advise whether you agree to comply with this cease and desist order.

Please call if you have any questions. Thank you for your cooperation in this investigation.

Yours very truly,
/s/James M. Smith
Administrator and Counsel

### APPENDIX 8

Commission on Retirement, Removal and Discipline

September 28, 1986

Mr. F. William McAlpin
Attorney at Law
611 Olive
St. Louis, Missouri 63101

RE: The Honorable Alphonso Voorhees

Dear Mr. McAlpin:

This is to acknowledge receipt of Judge Voorhees' letter dated August 28, 1986. A copy of this letter has been forwarded to each member of the Commission for their evaluation.

Supreme Court Rule 12.08(b)(3) states:

"If the cease and desist order in subparagraph (b)(2) is issued the person under investigation shall either:

(a) Agree in writing to comply with the order in which case the complaining party shall be notified of such action;

(b) Refuse to agree in writing to comply with the order, in which case formal proceedings shall be instituted."

Upon review of the Judge's response, it is unclear to the Commission as to whether he has agreed to comply with the Commission's order. Such an agreement or refusal is required under Rule 12. However, the Commission does not wish to preclude the Judge from making any accompanying explanatory statement.

The Commission would appreciate a clarifying response from the Judge. Thank you for your time and consideration in this matter.

Yours very truly,
/s/James M. Smith
Administrator and Counsel

### APPENDIX 9

In the Supreme Court of Missouri

IN CAMERA

Hon. Alphonso H. Voorhees, Relator,

v.

Hon. Robert G. Dowd, Hon. L. Thomas Elliston, Jack W.R. Headley, J.B. Schnapp, Gary A. Abram, and Morris E. Blitz, as members of the Commission on Retirement, Removal and Discipline, Respondents.

No.

PETITION FOR WRIT OF PROHIBITION

Comes now the Relator and as his Petition for a Writ of Prohibition to be directed to Respondents states and alleges:

1. Relator is a duly elected and qualified Circuit Judge of the 21st Judicial Circuit of Missouri and until January 1, 1987 was the Presiding Judge of said Circuit.

2. Respondents are the duly appointed, qualified and acting members of the Commission on Retirement, Removal and Discipline of the State of Missouri. Hon. Robert G. Dowd is the member of said Commission representing the judges of the Court of Appeals, is the secretary and, on information and belief, is the acting chairman of said Commission. Hon. L. Thomas Elliston is the member of the Commission representing the Circuit Judges of the state. Jack W.R. Headley is a lawyer member of the Commission appointed by the Board of Governors of The Missouri Bar; and J.B. Schnapp is a lawyer member of the Commission serving in the place and stead of Godfrey P. Padberg, a regular member of said Commission who has recused himself in the matter pending before the Commission which is the subject of this Petition. Messrs. Gary A. Abram and Morris E. Blitz are citizen members of the Commission appointed by the Governor of Missouri.

3. On February 27, 1986, Relator, in the exercise of his responsibilities as the Chief Administrative Officer of the 21st Judicial Circuit upon the written authorization of a majority of the Circuit Judges of the 21st Judicial Circuit, issued separate, identical administrative orders to four Associate Circuit Judges of said circuit. Copies of those orders are appended as Exhibits 1 A, B, C and D to this Petition.*

4. On February 28, 1986, the four Associate Circuit Judges who were the subjects of said administrative orders filed in this Court their Motion for Administrative Order to Quash Administrative Orders Of The Presiding Judge Of The Twenty-First Judicial Circuit of Missouri, which became Cause No. 67950 in this Court. A copy of said motion is attached as Exhibit 2 to this Petition.

5. Among the grounds for said motion as alleged by the four Associate Circuit Judges were that the administrative orders issued by Relator:

a) Amount to severe discipline of Applicants without hearing or just cause;

b) Usurp the authority of the Commission on Retirement, Removal and Discipline;

c) Are in excess of the authority of the Presiding Judge, said authority resting only in this Court;

d) Do immediate, irreparable harm to Applicants;

e) Are false in their entirety in their accusation that by act and deed Applicants in any way failed to abide by the orders of the Presiding Judge; and

f) Are in direct violation of Guideline No. 13, General Authority of Judicial Officers, as stated by this Court in its *Per Curiam* Opinion in Cause No. 67397.

6. In response, this Court on February 28, 1986, issued its interim order in Cause No. 67950 staying the administrative orders of Relator appended as Exhibits 1 A through D hereof and directing the four Associate Circuit Judges to carry out and perform all of the duties and functions of their office until further order of this Court or further order of the circuit judges acting through the presiding judge of the 21st Judicial Circuit. A copy of said order is appended as Exhibit 3 hereto.

7. Thereafter, on or about April 1, 1986, three of the four Associate Circuit Judges filed a consolidated motion in Cause Nos. 67950 and 67397. The additional motion in No. 67950, after reiterating Relator's issuance of his February 27 orders and referring to this Court's order of February 28 and the subsequent lack of action, alleged Relator's issuance of two other administrative orders which this Court was requested to quash. The portion of the consolidated motion addressed to Cause No. 67397, although titled on the cover page a motion to appoint a master to serve as presiding judge, in the body of the motion itself and in the prayer asked only that this Court vacate the opinion reported at 702 S.W.2d

* EDITOR'S NOTE: Exhibits 1A–1D and Exhibits 2–12, referred to in Appendix 9, were omitted from publication by direction of the opinion author.

457. A copy of that consolidated motion is attached as Exhibit 4.

8. On April 8, 1986, Relator and thirteen (13) other Circuit Judges filed their response to the motions of the Associate Circuit Judges. A copy of that response is attached as Exhibit 5 hereto.

9. On May 13, 1986, this Court filed its final order in Cause No. 67950 overruling in their entirety the three motions filed by the Associate Circuit Judges and adhering to the position as stated in its order of October 11, 1985 in Cause No. 67397, 702 S.W.2d 467. A complete copy of this Court's filing of May 13, 1986 is attached as Exhibit 6 to this Petition.

10. It now appears that on March 5, 1986, while their motion in Cause No. 67950 was pending in this Court, the four Associate Circuit Judges filed with Respondents their complaint attacking the administrative orders issued by Relator on February 27, 1986, attached as Exhibits 1 A through D hereto, alleging *inter alia:*

a) The allegations contained in the first paragraph of said orders were and are totally false;

b) The orders were issued without notice or hearing;

c) The orders were in excess of the authority of Relator as presiding judge;

d) The orders were a usurpation of the power constitutionally conferred upon the Commission on Retirement, Removal and Discipline and this Court;

e) The orders were in direct violation of each and all of the six guidelines set forth in Guidelines from Presiding Judges Handbook No. 13, which was attached as an exhibit to said complaint; and

f) The orders as made public by the news media did irreparable damage to the judicial system, held such system and (presumably applicants) up to public ridicule, caused embarrassment and humiliation not only to (them) but to the entire legal profession and had irrevocably damaged the careers of (the complainants). A copy of said letter of complaint as furnished by Respondent's counsel to counsel for Relator is attached as Exhibit 7 hereto.

11. Subsequently on March 17, while the motion of the four Associate Circuit Judges attacking the same orders on the same grounds was still pending in this Court, Respondents directed to Relator a letter requesting that he respond to the charges set forth in their letter, which were essentially the same charges made by the complainants to Respondents and to this Court in their motion in Cause No. 67950. A copy of said letter is attached as Exhibit 8.

12. On or about April 11, 1986, Relator replied to Respondents' said communication of March 17 raising the question of their jurisdiction pointing out that his orders, which were being challenged, had been issued by him in matters relating to dockets and court facilities and thus to the administration of the 21st Judicial Circuit, that matters of court administration were not within the jurisdiction of Respondents and that the allegations contained in their communication duplicated the allegations made by the complaining Associate Circuit Judges in this Court in Cause No. 67950. A copy of said communication is attached as Exhibit 9 hereto.

13. Under date of July 14, 1986, Respondents replied to Relator asserting their jurisdiction over administrative matters, when in their view such matters violate Rule 2 of this Court; and, relying upon the opinion of Hon. Edward D. Robertson, Jr. of this Court concurring in part and dissenting in part in Cause No. 67950, declared the administrative orders of Relator appended as Exhibits 1 A through D hereto in violation of Guideline No. 13 set out in the Appendix to this Court's opinion reported at 702 S.W.2d 457, 452, and ordered Relator to follow the directives of this Court as outlined in said Appendix. A copy of said communication is appended as Exhibit 10 hereto.

14. On August 28, 1986, Relator replied to Respondents' said communication of July 14, denying any violation of Guideline No. 13, expressing his full acceptance of said Guidelines and his intention to follow

them but declining to consent to the cease and desist order proposed by Respondents as an admission of a violation of any orders of this Court. A copy of that communication is attached as Exhibit 11 hereto.

15. On or about November 24, 1986, Relator received from Respondents a Notice to appear before them on January 28, 1987, to answer the charge that he had violated Article 5, Section 24 of the Constitution of Missouri, that the administrative orders issued by him on February 27, 1986, (Exhibits 1 A through D hereto) were improper and failed to abide by the procedures set out in Guideline No. 13 of the Appendix to this Court's decision reported at 702 S.W.2d 457, 462 and that that conduct was in violation of Supreme Court Rule 2, Canon 3 B(1), (2) and (3). A copy of said notice is appended as Exhibit 12 hereto.

16. From the foregoing, it is apparent that Respondents propose to conduct a disciplinary hearing affecting Relator based upon Relator's issuance of the administrative orders which this Court declined to quash in Cause No. 67950.

17. The asserted basis of Respondents' notice of hearing is that those orders purported to relieve the complaining Associate Circuit Judges of their dockets and of control of their courtrooms and chambers, presumably (though not specifically alleged to be) in excess of his authority, and that said orders of Relator violated Guideline No. 13 of the Guidelines from the Presiding Judges' Handbook set out in the Appendix to the decision reported at 702 S.W.2d 457, 462, all of which was a basis of both the complainants' motion to this Court in Cause No. 67950 and their complaint to Respondents.

18. The issues of the validity of those administrative orders of Relator as affecting the complaining Associate Circuit Judges and vis-a-vis Guideline No. 13 were raised and decided in Cause No. 67950, are precluded from Respondents' consideration by this Court's order of May 13, 1986, Exhibit 6 hereto, and thus are outside their jurisdiction.

19. Under the provisions of Article 5, Section 24–3. of the Constitution of Missouri, Respondents after conducting the proposed hearing can only recommend to this Court any discipline to be administered to Relator; thus, this Court would, in the event of a decision recommending discipline, be presented with exactly the same issues which were before it and decided in Cause No. 67950.

20. It would be anomalous, inconsistent and incongruous for this Court to accept and concur in a recommendation of discipline of Relator for the issuance of orders which this Court has declined to quash.

21. In conducting the proposed hearing, Respondents would be acting in excess of or beyond their jurisdiction because the issues which they have raised have already been decided by this Court.

22. It is clear that Relator's orders of February 27, 1986, were issued by him in the exercise and discharge of his responsibilities as the chief administrative officer of the 21st Judicial Circuit as authorized by a majority of the Circuit Judges. The motion filed by the four Associate Circuit Judges in this Court (Exhibit 2) by its caption acknowledges that they were administrative orders and that they were requesting this Court to quash these orders in the exercise of its administrative authority over the judicial system under Article 5, Section 8 of the Constitution of Missouri.

23. Such administrative matters lie wholly within the jurisdiction of the presiding judges of the several judicial circuits of this state, the Chief Justice of Missouri and this Court.

24. In addressing the propriety of administrative orders issued by Relator in his capacity as the Chief Administrative Officer of the 21st Judicial Circuit, Respondents are acting in excess of and beyond the limits of their jurisdiction.

25. Respondents' Notice fails to state a valid basis on which they could recommend to this Court that Relator be the subject of discipline.

26. Forcing Relator to undergo the expense and burden of a hearing before Re-

spondents, when the issues raised by their Notice are clearly barred by the prior adjudication of this Court and beyond the jurisdiction of Respondents, would be unjust and unreasonable.

27. Submission to such a hearing with the prospect of the eventual reference of such matter by Respondents to this Court is not an adequate remedy in the premises.

WHEREFORE, Relator prays that this Court issue its writ prohibiting Respondents from conducting the hearing on January 28, 1987 as proposed in their Notice of November 24 or on any date and from further processing the complaint lodged with them on March 5, 1986.

> LEWIS & RICE
> /s/By F. Wm. McCalpin, # 13825
> 611 Olive Street, Suite 1400
> St. Louis, Missouri 63101
> (314) 444-7600
> EVANS & DIXON
> /s/By Eugene K. Buckley,
> # 15334
> 314 N. Broadway, Suite 1600
> St. Louis, Missouri 63102
> (314) 621-7755
> Attorneys for Relator

APPENDIX 10

Supreme Court of Missouri

en banc

January 16, 1987

IN CAMERA

Hon. Alphonso H. Voorhees, Relator,

vs.

Hon. Robert G. Dowd, Hon. L. Thomas Elliston, Jack W.R. Headley, J.B. Schnapp, Gary A. Abram, and Morris E. Blitz, as Members of the Commission on Retirement, Removal and Discipline, Respondents.

ORDER

*In camera* petition for writ of prohibition is denied.

> /s/ANDREW JACKSON HIGGINS,
> Chief Justice

Blackmar, Donnelly and Welliver, JJ., would issue the preliminary order.

RENDLEN, Judge, concurring in result.

On Thursday, February 27, 1986 respondent, by separate orders, directed that four associate circuit judges in St. Louis County be "relieved of all docket, caseload and trial responsibility" as judges of their respective courts and ordered each to "relinquish control of your facilities including your courtroom and chambers until further order of the presiding judge." These orders directed to Judges George R. Gerhard, Joseph A. Goeke, III, Daniel J. O'Toole, and Dennis J. Quillin, associate judges of the Twenty-First Circuit, effectively suspended them from their offices and functions as judicial officers. In so doing, respondent exceeded his authority as presiding judge. As noted in the principal opinion respondent testified his purpose was not to discipline the four associates, but be this as it may, he made arrangements for three circuit judges and an associate circuit judge to replace those suspended from their lawful function in the Court.

The following day, the suspended judges moved for an order of this Court to quash the "administrative orders of the presiding judge of the 21st Judicial Circuit of Missouri," asserting that such were "in excess of the authority of the presiding judge, said authority resting only in the Supreme Court." The matter was ruled that date and respondent's orders to Judges Gerhard, Goeke, O'Toole and Quillin were stayed. Additionally, they were directed to perform the duties of their office until (1) further order of this Court or until (2) further order of the circuit judges acting through the presiding judge of the circuit under *In re: Rules of Circuit Court for the 21st Judicial Circuit*, 702 S.W.2d 457 (Mo. banc 1985).

The Commission on Removal, Retirement and Discipline in its findings and conclusions of April 15, 1987, relates how on July 14, 1986, more than four months following this Court's stay order, it issued a cease and desist order under Rule 12.08(b)(2) directing that respondent refrain from any

further attempts to relieve the said associates of their duties by any means other than those specifically authorized by law. Had there been an agreement to comply with this order, it would have returned the status quo and ended the current disciplinary proceeding. While this might not have resolved the longstanding problems of the 13 circuit judges who endorsed the suspension order *vis a vis* the remaining circuit and associate circuit judges of the Twenty-First Circuit, it would have had the salutary effect of relieving the pressures created by respondent's orders of February 27, 1986.

In this disciplinary proceeding the notice issued by the Commission on December 5, 1986, charged respondent with having "engaged in conduct which was in violation of Article V, sec. 24 of the Constitution of the State of Missouri." The conduct charged as violative of Article V, sec. 24 included the following:

1. That on February 27, 1986, you issued an administrative order as Presiding Judge of the 21st Judicial Circuit to Associate Circuit Judges George R. Gerhard, Joseph A. Goeke, III, Daniel J. O'Toole and Dennis J. Quillin purporting to relieve the named Associate Judges of their dockets and directing that they relinquish control of their courtrooms and chambers.

It was additionally charged:

Further, that this order failed to abide by the procedure set in Guideline No. 13 of the Guidelines from the Presiding Judges' Handbook which were specifically set out in the Appendix to the Supreme Court's decision *In Re: Rules of the Circuit Court for the 21st Judicial Circuit*, 702 S.W.2d 457, 462 (Mo. banc 1985).

The notice concluded that the "above mentioned conduct is in violation of Supreme Court Rule 2, Canon 3B(1), (2), (3)."

Canon 3B(1) provides:

A judge should diligently discharge his administrative responsibilities, maintain professional conduct in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court officials.

The Commission in its findings and conclusions of law stated:

there is no specific constitutional or statutory authority for a presiding judge to order the removal of associate circuit judges from their courtrooms and chambers and relieve them from their judicial responsibilities, under the circumstances such as were present in this case. Such action by [respondent] constituted an act of severe discipline of the four associate circuit judges. The sole authority for discipline of judges rests with the Commission and the Supreme Court. Article 5, sec. 24 Constitution of Missouri.

The Commission further found that

"the action of [respondent] in issuing the orders in question, and the inevitable publicity that followed, add another sorry chapter to the history of the internal bickering that has marred the image of the circuit court of the 21st Judicial Circuit in recent years."

Notwithstanding such findings, the Commission concluded there had been no breach of Canon 3B(1). However, it remains the responsibility of this Court under Rule 12.08(c) to "review the record, consider the recommendation of the Commission and make such order as to respondent as [this Court] deems just." The record in this case amply justifies a conclusion that respondent did in fact breach Canon 3B(1); however, I am constrained for reasons hereinafter discussed to concur with the order of the principal opinion discharging respondent.

Significantly, this Court's prompt stay order prevented the immediate disruption that would have resulted had respondent's improper order been permitted to take effect. Further, I agree with the finding that "Judge Voorhees has enjoyed, throughout his legal and judicial career, an excellent reputation for integrity, industry and temperament." In addition, we should be mindful that the orders of respondent as presiding judge stemmed from a collegial action in which respondent joined with some 13 circuit judges who participated in

and must share responsibility for promulgating the orders suspending the associate circuit judges. Of equal importance is the fact that immediately prior to the formulation of the order suspending the associate judges, respondent, with circuit judges William Corrigan and Robert Saitz, conferred with then Chief Justice Higgins on February 25, 1986, concerning the internal problems of the 21st Circuit.

In their testimony before the Commission, each of the three circuit judges stated that the possibility of suspending the associate circuit judges was discussed with the Chief Justice. Judge Corrigan recalled one of the items mentioned "was the possibility of getting four judges in to take their places in the event we did this." Further, each of the circuit judges described how they were told by the Chief Justice that *any* action taken by the presiding judge concerning the internal problems of the Twenty-First Circuit, if authorized by a majority of the circuit court judges, would be supported by the Supreme Court.

Thus, rightly or wrongly, the three returned to St. Louis with the perception that if they acted with the concurrence of a majority of the circuit judges it was permissible to promulgate the orders of February 27, 1986, which led to the current difficulties.

Another factor. contributing to the present impasse is the atypical judgment of this Court of October 11, 1985, in the cause styled *"In re: Rules of the Circuit Court for the 21st Judicial Circuit"*, 702 S.W.2d 457. I did not participate in that judgment but feel it is necessary to express my views concerning what appears to me an improvident decision of this honorable Court. To better understand the relevance of that October 11 decision to the matter now before the Court, we must review the issues raised there. The Missouri Constitution, Art. V, sec. 15.3 provides that

> the circuit and associate circuit judges in each circuit shall select by secret ballot a circuit judge from their number to serve as presiding judge.

For reasons which I do not understand, and with which I do not agree, this Court in its per curiam opinion stated at p. 459:

> we now conclude that we cannot and *will not enforce* that part of Article V, sec. 15.3 which *purports* to grant to associate judges the right to participate in the election of presiding judge *pending further resolution* of the contradictory provision by *the people.*

(Emphasis added.) [1]

It was quite incorrect to suggest that Section 15.3 merely *purports* to grant the associates the power to vote in such election. To the contrary, the plain language of the section clearly and unambiguously provides that the circuit and *associate circuit judges* in each circuit "shall select by a secret ballot" a circuit judge from their number to serve as presiding judge. Further, there were no meaningful reasons espoused by that decision for invalidating that provision of the constitution. How can a validly adopted provision of the Missouri Constitution (which is neither violative of the Constitution of the United States nor diametrically opposed to another provision of the Missouri constitution) be selectively declared unenforceable simply

---

1. The quoted language of the October 11, 1985, per curiam does not specifically state that Art. V, Sec. 15.3 of the Missouri Constitution is invalidated or void, but instead announces it will not be *enforced.* This strange departure from the usual words declaring invalidation does not alter the fact that that portion of Art. V, Sec. 15.3, which confers the right to vote upon associate circuit judges was nullified and will remain unenforced until "further resolution ... by the people." This latter anomalous statement tells us that though the people had spoken in 1976 by adopting sec. 15.3, that was not enough. They must resolve the issue again by another vote, and if they do not, the section remains unenforceable. But were the people to reapprove sec. 15.3, what assurance is there it would not once more be declared unenforceable?

The per curiam of October 11, 1985, suggests that sec. 15.3 was the product of lobbying on the part of "the former magistrates for the purpose of staking out areas of political influence and patronage," or that it might have been the "unintended product of a well-intentioned but misunderstanding Bar and electorate." Thus the per curiam impugns the motives of the associate circuit judges of this state as well as the drafters of the article and questions the intelligence of the voters who adopted it.

because it is contrary to a general policy perceived by the Court? I am firmly convinced that the October 11, 1985, decision was an erroneous exercise of the judicial function which frustrated the will of the people expressed in article V, sec. 15.3.[2] In sum, the October 11, 1985, opinion presents an aberrant notion that the clear right of associate circuit judges to participate in the elective process contravened a "policy" perceived by the Court. Further that the judiciary should be run from the "top down" and that permitting the associate circuit judges to democratically participate in the elective process constitutes control from the "bottom up" which, the opinion concludes, cannot be tolerated and for that reason section 15.3, enfranchising the associate circuit judges, was invalidated. The move that led to this result had its roots in a February 1985 opinion of Judge Welliver appearing as a dissent to *Gregory v. Corrigan*, 685 S.W.2d 840 (Mo. banc 1985), a case in which this Court *upheld* the constitutional right of associate judges to participate in the election of the presiding judge. There Judge Welliver made this unusual statement when criticizing the principal opinion of *Gregory:*

> the principal opinion brings into sharp focus the fact that Sec. 15.3 [of the Missouri Constitution] appears contrary to and *out of step* with the unified court system contemplated and established by the other provisions of Article V.... Section 15.3 read as the majority reads it permits the *associate circuit judges together with* any dissident *circuit judges, to pass over any judge* or judges they deem *unacceptable and elect the presiding judge of their choice.*

(Emphasis added.) In that manner Judge Welliver demonstrated his personal distrust for the democratic process and his dissatisfaction with the constitutional provision allowing associate circuit judges to express themselves through the ballot box. He was disturbed that they might even join (perish the thought) with other circuit judges and provide a majority for election purposes, and he condemns the process with these words: "This is control from the bottom up and not from the top down." Judge Welliver's view was carried forward and reappears in the remarkably similar language of the October 11, 1985, per curiam opinion. I did not then, nor do I now, agree with the views expressed in the dissent of Judge Welliver in *Gregory* (February 1985) nor with those same views when they were adopted by the per curiam of October 1985. Clearly it is the view of the people expressed in sec. 15.3 that the associate judges perform a valuable function in the judicial elective process which should not have been denigrated by denying them their right to participate by secret ballot in the selection of their presiding judge.

The first opportunity presented to this Court to reexamine the decision of October 11, 1985, came in May of 1986 in a cause styled: "In re: Administrative Orders of the Presiding Judge of the 21st Judicial Circuit." There, three associate judges of the 21st Circuit filed motions to quash certain administrative orders of the presiding judge, sought the appointment of a master to assume the function of the presiding judge and finally requested reconsideration and withdrawal of this Court's opinion of October 11, 1985. Those motions were overruled and the Court adhered to its position announced on October 11, 1985, in 702 S.W.2d 487. However, in his memorandum concurring in part and dissenting in part,

---

**2.** The legislature has recently reaffirmed the right of associate judges to participate in the election of their presiding officer by enacting H.B. 222, 1st Reg.Sess., 84th General Assem., which repealed section 478.240, RSMo 1986, relating to circuit courts and enacted in lieu thereof a new provision. The language of the old statute stating that "[s]election procedures may be provided by Supreme Court Rule" was replaced with the following language consistent with art. V, sec. 15.3: "The circuit and associate circuit judges shall select by secret ballot a circuit judge from their number to serve as presiding judge."

Judge Welliver, in his separate opinion, expresses disappointment in this Court's failure to "at least comment" on H.B. 222. From this it may readily be inferred that Judge Welliver would find the new statute unconstitutional under *In re: Rules,* further evidencing a want of confidence in the people and their elected representatives.

Judge Robertson, commenting on the October 11 opinion stated:

> with the benefit of hindsight, I now believe that I was incorrect in joining in the October 11 decision, even to the extent of the limited temporary nature in which I believe it was cast.
>
> While it is beyond dispute that both factions in the circuit share fault—and there is plenty of that to go around—the October 11 decision appears to have encouraged those who felt vindicated by it to express their victory in radical terms.

I joined Judge Robertson in that expression of dissatisfaction with the October 11, 1985, decision and by this separate opinion reiterate my belief that the decision was erroneous. Had I been able to participate in the October 11th proceedings, I would have expressed my dissent to the opinion issued that day. The current events provide further evidence that the so-called "solution" of *In re: Rules* has become part of the problem.

It goes without saying that sec. 15.3, as a 1976 amendment to our Constitution, was entitled to protection as part of our fundamental law to which all others must conform. This Court in *State v. Dearing*, 364 Mo. 475, 263 S.W.2d 381 (1954), discussing amendments to the constitution, aptly observed "they are organic and in our opinion were not intended to be open to alteration by statute or construction of the courts." *Id.* at 385. Consistent with that principle, the first rule of construction of a constitutional amendment is to give effect to its intent and purpose. *Buechner v. Bond,* 650 S.W.2d 611, 613 (Mo. banc 1983). The Court in *Buechner* further observed that "since the amendment [involved in that case] has already been adopted and the people have demonstrated their will, *this Court's duty is not to seek to condemn the amendment, but, to seek to uphold it if possible.*" *Id.* at 612 (emphasis added). The Court then noted:

> ... the rules applicable to the construction of statutes are applicable to the construction of constitutional provisions; the latter are given broader construction due to their more permanent character. *Boone County Court v. State,* 631 S.W.

2d 321, 325 (Mo. banc 1982). Words used in constitutional provisions must be viewed in context: their use is presumed intended, and not meaningless surplusage. *Roberts v. McNary,* 636 S.W.2d 332, 335 (Mo. banc 1982). The words used in constitutional provisions are interpreted so as to give effect to their plain, ordinary and natural meaning ... (citation omitted) [which is] that meaning which the people commonly understood the words to have when the provisions were adopted.

*Buechner,* 650 S.W.2d at 613. Normally it would seem redundant to restate these time-tested rules for the construction of constitutional provisions. However, Judge Welliver's apparent disregard of the canons illustrates that when we do not steadfastly observe them, consistency in the law becomes an illusion and predictability in the decisional process is lost.

It is noteworthy that the majority opinion in *Gregory* (as contrasted with the dissent of Welliver, J., in that case) properly applied the canons and held that the plain language of Article V, Section 15.3 made clear the right of the associate circuit judges to participate in the elective process. It was expressed in these words:

> "The constitution could not be more explicit in requiring that both circuit and associate circuit judges participate in election of a presiding judge."

The Court went on in that well-reasoned opinion to hold that:

> "because the amended local rule in its present form effectively circumvents this constitutional directive [Article V, sec. 15.3] and is tantamount to a disinfranchisement, it is hereby declared invalid."

Speaking against this pellucid decision of the Court, Judge Welliver in his dissent argued that sec. 15.3 was out of step with his view of the law. Sadly, by October of 1985 Judge Welliver's dissenting view prevailed and the *Gregory* decision of February 1985 was effectively abandoned.

It would be remiss if certain aspects of Judge Welliver's separate opinion in the case at bar were allowed to pass without comment. He is particularly vehement in

his criticism of the associate circuit judges, whom he judges and condemns without benefit of due process or hearing. The so-called "evidence" upon which he relies in so doing, reduced to its essence, is the self-serving record of the February 1986 meeting between the handpicked unit managers and the reorganization committee, referred to as a "transcript" although it is not a record of an official legal proceeding. It appears that Judge Welliver reached his conclusions prior to the hearing in this case and well before the facts were presented to us. Indeed, he in effect concedes as much when he chastises this Court for denying respondent's petition for prohibition and declining to interfere in the work of the Commission. He states that we had before us at the time of that petition all "determinative" evidence. In other words, without a hearing or valid legal record he would have decided the matter and prevented the Commission from exercising its constitutional powers. He further decries the Commission's performance of its duties pursuant to its constitutional mandate in art. V, sec. 24.

Another disturbing aspect of Judge Welliver's separate opinion is its suggestion that respondent could have employed more stringent measures than those invoked and that Judge Higgins or this Court should have ordered in "judges to replace the dissident associates." Without citation of precedent, he declares that associate judges have "no prescriptive rights to the courtrooms," and concludes that respondent, as the presiding judge, was empowered to issue the suspension orders. He relies solely on sec. 478.240.2, RSMo 1986, pertaining to presiding judges, and while that statutory subsection confers upon presiding judges general administrative authority, nowhere does it contemplate or authorize the power to suspend associate circuit judges. It merely provides for the orderly assignment of cases of various classes to judges, and the legislature surely did not intend by its enactment to grant presiding judges the authority to oust lawfully qualified and serving associate circuit judges from office. Indeed, as noted *supra* at note 2, the legislature recently amended section 478.240 to prevent associate judges from being denied the right to

participate in the election of their presiding judge.

Once again I express my disagreement with the unfortunate decision of *In re: Rules*, which seems to have exacerbated conditions in the Twenty-First Circuit, and at the missed opportunity in this case to correct that decision. For the reasons herein discussed I concur in the result reached by the principal opinion.

DONNELLY, Judge, concurring in result.

*First*, a basic concept in our society is "that the people have a right to know." The opinions of Judges Blackmar and Welliver fully elicit the facts in this case. However, in my view, the *principal opinion* of the Court need only read as follows:

## JUDICIAL DISCIPLINARY PROCEEDING UNDER MO. CONST. ART. V, Sec. 24

*Per Curiam:*

Respondent, The Honorable Alphonso H. Voorhees, is a Circuit Judge of the Twenty-First Judicial Circuit, and was the presiding judge during late 1985 and all of 1986. The Commission on Retirement, Removal and Discipline established by Art. V, Sec. 24, of the Missouri Constitution served a notice on him charging violation of this Court's Rule 2, Canon 3 B (1), (2), (3). After hearing, the Commission filed Findings of Fact, Conclusions of Law and Recommendations. The Commission found violation only of Canon 3 B (3), reading as follows:

> A judge should report what he believes clearly to be professional misconduct of a judge or lawyer to the appropriate disciplinary agency.

It recommended that Respondent be reprimanded for this perceived violation.

The matter is now before us on the respondent's exceptions to the Findings, Conclusions and Recommendations of the Commission. We conclude that the record does not support the recommendation for discipline, and direct that the respondent stand fully discharged.

*Second*, it being beyond the jurisdiction of the Commission on Retirement, Removal

**220**

and Discipline to administer the courts of Missouri, I would enter the following order:

ORDER

WHEREAS, under the Constitution of Missouri "[t]he chief justice of the supreme court shall be the chief administrative officer of the judicial system and, subject to the supervisory authority of the supreme court, shall supervise the administration of the courts of this state." Mo. Const. art. V, § 8.

NOW, THEREFORE, IT IS ORDERED THAT:

1. The chief justice of this Court shall immediately confer with the present Presiding Judge of the 21st Judicial Circuit and shall then, with the concurrence of a majority of this Court, take such actions and institute such procedures as are necessary and proper to assure the orderly administration of justice in the 21st Judicial Circuit.

2. When a majority of this Court believes that the orderly administration of justice in the 21st Judicial Circuit can be assured, a new election of a presiding judge in the 21st Judicial Circuit shall be held in which the associate judges shall participate. Mo. Const. art. V, § 15, subd. 3.

I concur in result.